**In re SUNCRUZ CASINOS LLC,
Jab America, Inc., Debtors.**

**Nos. 01–24661 BKC JKO,
01–24662 BKC JKO.**

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale Division.

May 1, 2006.

Arthur H. Rice, Esq., Miami, FL, for Debtors.

### ORDER ON JOINT MOTION OF PLAN ADMINISTRATOR AND WELLS FARGO FOOTHILL, INC., FOR CIVIL CONTEMPT AND SANCTIONS AGAINST THE AMERICAN CLUB

These confirmed chapter 11 cases came on for hearing on March 20, 2006, on the joint motion (the "Motion") [CP 3347] of Jeffrey H. Beck, the post-confirmation Plan Administrator for these liquidating Debtors, and Wells Fargo Foothill, Inc. ("Foothill," and together with the Plan Administrator, the "Movants") seeking an or-

der of this Court pursuant to 11 U.S.C. §§ 1129 and 105(a) and Federal Rules of Bankruptcy Procedure 9020 and 9014 holding the Debtors' maritime insurer, The American Club (the "Club") in civil contempt and awarding sanctions for violation of this Court's permanent injunction entered as part of the Order confirming the chapter 11 Plan of Liquidation for the Debtors [CP 3208] entered February 14, 2005 (the "Confirmation Order"). The parties entered into a Stipulation of Undisputed Facts [CP 3406]. All of the facts necessary to a determination of the Motion are set forth therein.[1]

### Jurisdiction

This Court has jurisdiction over the matters presented pursuant to the provisions of 28 U.S.C. §§ 157(a) and 1334(b). This is a civil proceeding arising in a case under Title 11, United States Code, and is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). The Court's power to determine that a party is in contempt of the court is based both in 11 U.S.C. § 105(a), *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc.,* 108 F.3d 609 (5th Cir.1997), and in the inherent power of the federal courts to sanction contemptuous conduct. *Eck v. Dodge Chemical Co.,* 950 F.2d 798 (1st Cir.1991). Proceedings in connection with a motion for an order of contempt are governed by Federal Rule of Bankruptcy Procedure 9020.

### Background

The Debtors filed their chapter 11 petitions in June of 2001. In September 2003, the Court appointed Jeffrey H. Beck as chapter 11 trustee (the "Trustee") for the Debtors. A liquidating chapter 11 Plan for the Debtors was filed by their primary

---

1. Wells Fargo Foothill, Inc., also filed a Statement of Unstipulated Facts [CP 3405] which, while helpful in understanding the Movants' position, does not set forth any facts necessary to a determination of the Motion.

secured creditor, Foothill, and that Plan was confirmed by the Confirmation Order. The Plan became effective on June 1, 2005, and the Trustee thereupon became the Plan Administrator.

The Debtors were insured members of the Club, a maritime liability insurer, from February 20, 2002—some eight months after they filed their chapter 11 petitions—through April 9, 2004 (the "Coverage Period"), the date on which the Debtors closed on the sale of substantially all of their assets (including gambling vessels) to Ocean Casino Cruises, Inc., and Vessel Casinos, Inc., pursuant to a sale under 11 U.S.C. § 363. Each vessel owned by the Debtors was separately scheduled in the insurance certificate, and these vessels are known collectively as the "Scheduled Vessels."

After the asset sale in April 2004, the parties to the chapter 11 case negotiated a Plan for the liquidation of the Debtors' estates. It was clear at that time that Foothill, which held liens against the Debtors' significant assets, was substantially unsecured: it was owed far more by the Debtors than its collateral proved to be worth. The parties agreed that Foothill would propose a chapter 11 Plan that would be. funded out of the cash on hand otherwise encumbered by Foothill's first lien, including cash set aside and earmarked to fund a $1.5 million carve-out for distribution to unsecured creditors and, in addition, for Foothill to pay all administrative expenses in full. It thus became critical to the willingness of the parties to proceed with confirmation of the Plan for the amount of administrative expense to be quantified.

Accordingly, the Trustee sought and on August 2, 2004 the Court entered an Order. [CP 2871] establishing a bar date for the filing of administrative expense claims. The bar date was fixed at September 15, 2004. Thereafter, the Trustee learned that there were other potential post-petition administrative claimants, including the Club, who had not been given notice of the September bar date. The Trustee therefore requested a further deadline for these potential administrative expense claimants, and the Court entered an Order on November 29, 2004 [CP 3069] which fixed December 31, 2004 as the extended bar date (the "Extended Administrative Expense Bar Date") and directed that formal notice (the "Notice") in a prescribed form be given to those potential administrative expense claimants to whom the Order applied. That Order identified the particular contingent claimants to whom it applied, including the Club, and provided in paragraph 6:

> Pursuant to Bankruptcy Rule 3003[c], if any Potential Claimant fails to file proof on an Administrative Expense Claim such that it is *actually* received by Kapila at the address specified above prior to the Extended Administrative Expense Bar Date, then such Administrative Expense Claim will be barred and discharged, and the holder of such Administrative Expense Claim will have no right to assert such Administrative Expense Claim against the Debtors, the Debtors' estates, or the Trustee.

The Notice provided in bold print that: **Any Potential Claimant who is required, but fails, to file a request for payment of an Administrative Expense by 5:00 p.m. (Eastern Time) on or before the Extended Administrative Expense Bar Date will be forever barred, estopped, and enjoined from asserting such Administrative Expense against the Debtors and their property, and the Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense.**

Although it was timely served with the Notice, the Club did not file any administrative expense claim.

The Foothill-sponsored Plan was confirmed by the Court on February 14, 2005 and became effective on June 1, 2005. The chapter 11 Trustee, Jeffrey H. Beck, became the post-confirmation Plan Administrator.

The Confirmation Order includes specific injunctive language regarding the right of any party to assert a pre-confirmation claim:

... all entities that hold pre-Confirmation Claims against the Estates are permanently enjoined from taking any of the following actions on account of any such claims: ... (4) asserting a right of setoff, right of subrogation or recoupment of any kind against any obligation due to the Liquidating Debtors, the Plan Administrator or any other Property of the Estates;

The question before the Court is whether certain actions taken by the Club since entry of the Confirmation Order violate the terms of that injunction such that the Club is in contempt of the Court for acting in a manner prohibited by the Confirmation Order.

### Dealings with The American Club

As noted above, the Debtors' vessels became Scheduled Vessels insured by the Club (and the Debtors became "members" of the Club, which its counsel characterized at oral argument as a "mutual indemnity and protection society") under a post-petition contract effective February 20, 2002.[2] Premiums for that cover came in three forms: "Premiums," the "up front" charge for coverage; "Supplemental Calls," assessed on active Club members for current or prior years' coverage if claims experience exceeds anticipated levels; and "Release Calls," assessed against Club members who leave the Club, designed to cover prospective unasserted liability claims. The clear purpose of Release Calls is for a departing Club member to pay its share of estimated future liability claims so that the remaining Club members aren't stuck footing the bill.

The parties have stipulated that all Premium payments that were due for the period of the Debtors' membership, February 20, 2002 through April 9, 2004, have been paid in full. On that later date, the Scheduled Vessels were sold by the Debtors, and the new buyers continued as insureds under the Club,[3] adding an additional vessel. These changes are evidenced by the Club's Certificates of Entry dated March 3, 2004 and September 9, 2004, and the Fleet Endorsement dated June 14, 2004. The Scheduled Vessels continued to remain as Scheduled Vessels with the Club until February 20, 2005, when the new buyers moved the insurance cover elsewhere.

In October 2004, the Club issued a Supplemental Call to the Debtors for policy year 2002. That Supplemental Call was paid on or about December 30, 2004 as an administrative expense claim against the Debtors' estates, in an amount as to which

---

**2.** Annual maritime insurance cover for the North Atlantic traditionally commences on February 20 of each year, that date being the notional start of the year's shipping season.

**3.** Part of what was sold to the new buyers included a prepayment of Premium for insurance cover on the Scheduled Vessels for policy year 2004. The Trustee had financed the Premium payment pursuant to court order, and the buyers assumed that Premium financing agreement, which was front-end loaded, as part of the sale. It accordingly made sense for the buyers to continue the insurance cover with the Club for that year.

the parties have been unable to agree, but approximating $199,000.[4]

Notwithstanding its receipt in early December 2004 of the Notice of Supplemental Administrative Claims Bar Date, the Club filed no Proof of Claim in these chapter 11 cases. The Club specifically did not file an Administrative Proof of Claim (contingent, unliquidated, or otherwise), nor did it submit any bills or other requests for payment or claims that were unpaid on the Administrative Claims Bar Date, December 31, 2004.

The Court entered the Confirmation Order on February 14, 2005, containing the injunctive language noted above.

On February 20, 2005, the Club advised the Debtors that the buyers had terminated the policy and that the Club would be issuing a Release Call to the Debtors. The Club had continued to insure the Scheduled Vessels (and the additional vessel) through that date. As stated by the Club's counsel at oral argument, the Club "usually just looks to the ship for recovery of what is owed to it, because the Club has, usually, a maritime lien against those ships." When the ships were sold, the Club issued no Release Call to the Debtors because the Scheduled Vessels in the hands of the buyers would be assessed Supplemental Calls if claims experience warranted such. However, after the new buyers terminated the Scheduled Vessels' coverage by the Club, the Club could no longer look to its maritime lien on the Scheduled Vessels for Supplemental Calls. Accordingly, the Club thereafter notified the Debtors of Release Calls for policy years 2002, 2003, and 2004. The Movants contend that the Release Call for policy

year 2002 is the amount of $174,107.39. The parties have both represented in their pleadings on the Motion that the aggregate amount of Release Calls approximates $420,000. No amount has been paid on account of those Release Calls.

The Club's policies are indemnity in nature; that is, the insured must pay out on a liability claim before it seeks reimbursement from the Club. The Club and its insured members generally work cooperatively on the handling of claims. Indeed, the parties agreed that the Club and the Debtors (through the Plan Administrator) have continued to work cooperatively on the handling and defense of liability claims up to the present time. The parties further agree that indemnification payments were made by the Club on a regular and timely basis until February 2005.

What hasn't happened, however, is the payment by the Club of indemnity claims made by the Debtors since February 20, 2005. According to the Movants, the last indemnity payment made by the Club was on January 21, 2005[5] in the amount of $35,967.32. The Movants contend that the total amount of indemnity claims which they have submitted to the Club for reimbursement under the policy approximated $600,000 as of the date of the hearing on the Motion.

The Movants filed their motion to hold the Club in contempt on November 30, 2005. On February 15, 2006, the Club sent the Movants a letter formally declining coverage for any of the Debtors' indemnity claims. The letter states in part that "[s]ince SunCruz has not paid the premiums due to The Club within (60)

---

**4.** Wells Fargo Foothill, Inc.'s Statement of Unstipulated Facts.

**5.** The Movants' Statement of Unstipulated Facts [CP 3405] uses the date "January 21, 2004," but the context suggests that the in-

tended date was in 2005. The parties are in agreement that no indemnity payments have been made since prior to the policy termination in February 2005.

days from the date of 'insolvency, bankruptcy, assignment, or dissolution proceedings,' SunCruz has failed to abide by this particular section of Rule 5 of the American Club's Rules and the Club thus specifically invokes its right to decline cover as set forth herein."

No action has been brought by the Debtors against the Club in any forum to determine their rights to indemnity coverage by the Club for any personal injury claims, and neither this Court nor any other tribunal has issued any decision with respect to the existence *vel non* of such coverage.

## Discussion

■ There are no real factual disputes between the parties. There are two subsections of the relevant policy, or Club Rules, which either are, or are asserted to be, relevant here. The first is Rule 5, Section 2, which states:

> Should the Member fail to pay, either in whole or in part, any amount due from the Member to the Association ..., the Managers may give the Member notice in writing requiring the Member to pay such amount by any date specified in such notice .... In the event that the Member fails to make payment in full on or before the date so specified, the insurance of the Member (whether or not such insurance may already have ceased for any other reason) in respect of any and all vessels insured for account or on behalf of the Member shall be terminated without further notice or other formality.

The second is Rule 5, Section 3, which states:

> Should the Member or any affiliated company become insolvent or bankrupt or assign its property for the benefit of creditors or suffer the appointment of a receiver for its property or any part thereof or the institution of dissolution

proceedings by or against it, the Association shall not be liable for any claims whatsoever under this insurance unless, within sixty days from the date of occurrence of such insolvency, bankruptcy, assignment, receivership or dissolution proceedings, there are paid to the Association by or on behalf of the Member all premiums to become due and all possible assessments is unconditionally guaranteed by a responsible surety, and unless the Member shall have paid the loss, damage or expense for which it is claiming out of monies belonging to it absolutely and not by way of loan or otherwise.

Although the Club relied on Rule 5, Section 3 in its February 2006 letter denying coverage, and has relied upon that section in its briefs, the provision plainly has no application here. First, the Debtors were already chapter 11 debtors at the time that they first became members of the Club in February 2002. No bankruptcy event occurred during the term of the policy, and the Club surely knew of the existing chapter 11 case when it entered into the policy as of February 2002. No 60–day notice requirement could possibly apply here. Second, the section is plainly violative of 11 U.S.C. § 365(e)(1), which prohibits the enforcement of so-called *ipso facto* clauses which are conditioned on the insolvency or financial condition of the debtor or the commencement of a bankruptcy case. 3 *Collier on Bankruptcy* ¶ 365.07 (15th ed. rev.2006); *Citizens & Southern National Bank v. Thomas B. Hamilton Co.*, 969 F.2d 1013 (11th Cir.1992). The Club's reliance on Rule 5, Section 3 is unavailing. The unenforceable nature of contractual *ipso facto* clauses is a fundamental principle of bankruptcy law.

■ Rule 5, Section 2 presents a more interesting problem. That provision requires a Member to pay amounts which

the Club says are due by a date certain, and that the Member's failure to do so terminates the policy of insurance. The basic thrust of the Club's argument is that indemnity claims made by the Debtors need not be paid by the Club because the Debtors have failed to perform their obligations under the contract, namely the payment of the Release Calls for 2002, 2003 and 2004. Although not phrased this way in the Club's papers or at oral argument, the Club is essentially contending that the payment of those Release Calls was a condition precedent to the Club's contractual obligation to honor indemnity claims, and the failure of the Debtors to pay the Release Calls absolves the Club from any obligation to perform under the insurance contract, or at least from its obligation to pay indemnity claims.

The Club's argument has a lot of appeal as a matter of basic contract law; nonperformance of a material contractual provision by one contracting party (here, payment of Release Calls) may well justify nonperformance by the other contracting party (payment of indemnity claims) in a non-bankruptcy context. But the existence of the bankruptcy brings into play a whole new set of rules which fundamentally alter the legal landscape and adjust in material ways the enforceability of contractual provisions.

Chapter 11 cases adjust the relationship between debtors and their creditors and shareholders. Debts can be discharged; secured claims stripped down; assets sold free and clear of liens; equity wiped out. The mechanism of chapter 11 works through compromise among the parties in interest in the case, and a chapter 11

plan—whether it be a conventional reorganization with the debtor emerging with a restructured balance sheet or a complete liquidation as here—requires the consent of the various affected constituencies or the hammer of cramdown on a particular class or classes of claims or interests under 11 U.S.C. § 1129(b).

In order for parties to give informed consent to the deal that is presented to them, chapter 11 requires the sharing of knowledge, both formally through the disclosure statement process under 11 U.S.C. § 1125 and informally through, for example, the statutory right of a creditors' committee appointed under § 1102 to consult with the trustee or debtor in possession, investigate the financial condition of the debtor, and participate in the formulation of a plan, all as contemplated by § 1103. The same rights exist *de facto* in the relationship between the trustee or debtor in possession and the secured creditors in the case.

One of the most fundamental pieces of information required for creditors and other parties in interest to make informed decisions is knowledge of the universe of claims. For example, these cases provided for a fixed amount of cash, $1.5 million, to be carved out from the funds in which Foothill had a security interest to be paid out to unsecured creditors on a *pro rata* basis, what is known in the business as a "pot plan." In a normal case, it would obviously be important for unsecured creditors to know how big the universe of unsecured claims was in determining whether to support or oppose confirmation of that plan.[6]

---

**6.** That analysis was probably not so important in cases like these, where all of the cash involved was subject to Foothill's lien; the analysis for unsecured creditors here was more likely, is there a reasonable prospect that more money could be extracted from Foothill's pocket using whatever leverage the unsecured creditors had. If the answer to that question was no, the unsecured creditors had very little choice.

And it would of course be material to Foothill in this case to know what the universe of administrative expense claims was so that it could analyze whether its agreement to pay those administrative expenses in full, plus the $1.5 million carve-out for unsecured creditors, made financial sense. It is here that the administrative claims bar date (September 15, 2004) and the Extended Administrative Expense Bar Date (December 31, 2004) come into play.

In chapter 11 cases, bar dates for the filing of claims are set by order(s) of the bankruptcy court pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3). It is not uncommon for there to be a variety of bar dates for different kinds of claims, and in a complex chapter 11 such as the cases of these Debtors, it is relatively normal for administrative expense claim bar dates to be set, as it was here at December 31, 2004, for any administrative expense claim which the Club had.

At oral argument, this Court and counsel for the Club had the following colloquy, TR p. 16, line 21, through p. 17, line 7:

THE COURT: Why didn't the American Club file a contingent claim?

MR. CURRAN: It didn't have a claim.

THE COURT: It didn't have a claim?

MR. CURRAN: At the time that it received notice in December 2004, from this Court, that there was going to be a confirmation plan submitted at the end of that month, so the Club had like two weeks' notice. *It didn't know the amount of any claim it might have. It knew it had a theoretical claim*, but the Club being a mutual indemnity and protection society, consists of members.... [emphasis added]

Counsel for the Club then continued, TR p. 17, lines 20–24:

MR. CURRAN: ...when those ships were no longer scheduled ships, and the new owner, Vessel Casinos—or Vessel—and Ocean Casinos Cruises were no longer associated with those ships, as of February 20, 2005, the Club immediately issued a release call....

The colloquy on this subject continued, TR p. 18, lines 11 to 23:

THE COURT: Mr. Curran, what I'm missing is if the American Club knew that there were contingent claims and it timely got the bar date notice and it was served with the plan and disclosure statement and it was served with the notice of confirmation, and the plan clearly provided that there could be no setoff or recoupment and anticipated the entry of a permanent injunction as part of the confirmation order that prohibited recoupment and setoff, why on earth did the American Club not file a contingent claim?

MR. CURRAN: Your Honor, I can't speak to that exactly. I mean, I think they probably made a mistake in all honesty.

At least some of the comments made by counsel for the Club suggest that the Club understood a "claim" to be something quite different from what a "claim" is in a bankruptcy case. The Court infers that the Club thought that a "claim" had to be both liquidated and matured before it could be asserted. However, the Bankruptcy Code defines "claim" in 11 U.S.C. § 101(5) [7] as follows:

---

**7.** This is the definition of "claim" in effect for this case. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 made a minor, non-material change in language.

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured, or unsecured;

 For bankruptcy purposes, a "debt" is a liability on a "claim." "By fashioning a single definition of 'claim' for the 1978 Bankruptcy Code, Congress intended to adopt the broadest possible definition of that term." *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991); *In re Udell*, 18 F.3d 403 (7th Cir.1994). When given the opportunity to narrow the definition of "claim," the Supreme Court has consistently declined to do so. *Federal Communications Commission v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). There is no question here but that in December 2004 the Club had—and knew it had—a contingent claim against the Debtors for Release Calls. That contingent claim matured in February 2005 when the Scheduled Vessels ceased to be insured by the Club, and the Club issued Release Calls to the Debtors shortly thereafter. The Court concludes that the Club failed to file a contingent claim by the Extended Administrative Expense Bar Date because the claim was not liquidated or fixed. Unfortunately for the Club, the fact that its prospective claim for Release Calls was contingent and unmatured on December 31, 2004, does not mean that the prospective claim was not a "claim" as to which a proof of claim had to be filed by the Extended Administrative Expense Bar Date if that claim were to be preserved.

 The Club has argued that it has substantive rights of setoff (arising at common law and preserved under 11 U.S.C. § 553) or of recoupment (arising solely at common law and with no statutory basis under the Bankruptcy Code). In general, the distinction between these two rights is that recoupment requires that the mutual obligations involved arise out of the same transaction or occurrence, regardless of whether the respective claims both arose pre– or post-petition. Setoff rights, by contrast, do not require the same transaction be involved, although both transactions giving rise to the setoff must either have occurred pre-petition or both must have occurred post-petition. *In re Anes*, 195 F.3d 177 (3rd Cir.1999). Since both the Debtors' right to indemnity and the Club's right to Release Calls arise under the same contracts of insurance, it seems that the Club's common law right is one for recoupment.

But giving the Club's common law right a name that doesn't answer the question, namely, does the requirement set by the Court for the filing of Administrative Expense Claims combined with the Club's failure to do so bar the Club from asserting its recoupment or setoff rights? The answer lies in the interplay between 11 U.S.C. § 553 and 11 U.S.C. § 1141.

Section 553 provides that Title 11

does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the

commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed; and certain other exceptions not relevant here.

■ By contrast, under the terms of § 1141, the provisions of a confirmed plan bind (among others) "any creditor ... whether or not the claim or interest of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan," with two exceptions, one of which is tangentially relevant here. Under § 1141(d)(3), the confirmation of a chapter 11 plan does not discharge a debtor if (as here):

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

[C] the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

Under chapter 7, only a debtor who is an individual can receive a discharge under § 727(a). The net effect of the provisions of § 1141(d)(3) is that a corporate debtor which is liquidated under chapter 11 and does not continue in business after its chapter 11 plan goes into effect does not receive a bankruptcy discharge. Accordingly, the Club's setoff or recoupment rights were not discharged by the confirmation order.

■ However, the Plan is still binding on the Club. Decretal paragraph 7 of the Confirmation Order provides that

7. As of the Effective Date of the Plan, the Debtors' right, title and interest in and to the Property shall vest in the Liquidating Debtors for administration, liquidation, and distribution in ac-

cordance with the Plan. The Property shall vest in the Liquidating Debtors free and clear of all Claims, liens, Interests and encumbrances, except as otherwise provided for under the Plan.

Decretal paragraph 13 of the Confirmation Order provides

13. As of the Effective Date, all entities that hold pre-Confirmation Claims against the Estates are permanently enjoined from taking any of the following actions on account of any such claims: ... (4) asserting a setoff, right of subrogation or recoupment of any kind against any obligation due to the Liquidating Debtors, the Plan Administrator or other Property of the Estates; and (5) commencing or continuing any action that does not comply or is inconsistent with the Plan.

Under these two Plan provisions, all of the Debtors' rights in the insurance policy with the Club vested in the Liquidating Debtors "free and clear of [the Club's] Claims," and the Club was permanently enjoined from "asserting a setoff ... or recoupment of any kind against any obligation" due to the Debtors.

The circuit courts which have considered the interplay between §§ 553 and 1141 have focused on whether a setoff or recoupment right has been expressly dealt with during the debtor's case. The Ninth Circuit in *In re De Laurentiis Entertainment Group, Inc.*, 963 F.2d 1269 (9th Cir. 1992) took the view that because the party which had contracted with the debtor and which sought to assert a setoff had filed a proof of claim and had diligently pursued its claim during the chapter 11 case, the balance between §§ 553 and 1141 should tilt in favor of a continuing right of setoff. The confirmation order did not address the issue of whether setoff rights were preserved or extinguished and the bankruptcy court "apparently assumed that NBC's

claim [to a setoff] would survive the order confirming reorganization, since it scheduled discovery and other proceedings even after the reorganization plan was confirmed."

By contrast, the District Court and Third Circuit ruled in *In re Continental Airlines, Inc.*, 218 B.R. 324 (D.Del.1997), *aff'd.*, 134 F.3d 536 (3rd Cir.1998) that a creditor's right of setoff is extinguished by a confirmed chapter 11 plan unless the plan expressly preserves it. In *Continental*, the plan prohibited any setoff right without the express consent of the reorganized debtor, and the court held that the United States was accordingly prohibited from asserting any setoff rights against funds held in the Registry of the Court.

This Court does not need to decide whether the effect of confirmation under § 1141 includes the extinguishment of setoff or recoupment rights if the chapter 11 plan is silent on the subject. Where, as here, however, the Plan expressly prohibits the assertion of any setoff or recoupment rights, the Court finds that such a provision is binding on creditors and parties in interest to the case, including the Club. That conclusion is necessary here. The Trustee and Foothill obtained orders from the Court fixing Administrative Expense Claim bar dates, and the Extended Administrative Expense Bar Date was expressly addressed to only 49 potential administrative expense claimants, of whom the Club was one. The Club was served with the Plan and Disclosure Statement and had full opportunity to object to the proposed prohibition on the assertion of setoff or recoupment rights. Instead, the Club ignored the ringing bells and flashing lights and did nothing.

Even after the Confirmation Order was entered, the Club could have sought relief. The Confirmation Order was entered on February 14, 2005. A mere six days later, the Club knew that it had quantifiable Release Calls it wished to assert against the Debtors. At that point, reconsideration of the Confirmation Order could have been sought under either Federal Rules of Bankruptcy Procedure 9023 or 9024, applying Fed.R.Civ.P. 59 and 60, respectively. The Club still did nothing.

The Club has asserted no basis whatever for refusing to reimburse the Debtors under its contractual indemnity obligations other than its assertion that the policies are no longer in effect because the Debtors have not paid the Release Calls. The Club's brief states that "while the American Club has denied cover to SunCruz due to SunCruz's breach of the applicable contract with the American Club, the Club also asserts a right of recoupment to amounts owed by SunCruz to the American Club for all years that SunCruz was a member." The only "breach" to which the Club has referred is the Debtors' failure to pay the Release Calls. Because the Club did not file a contingent claim within the Extended Administrative Expense Bar Date, its right to assert any entitlement to payment on the Release Calls, together with its right to assert setoff or recoupment defenses to the Debtors' indemnification claims, were extinguished by the Confirmation Order, and the Club's refusal to perform is contumacious.

### Procedural issues

■ The Club contends that the Motion is premature, in that no court or tribunal has determined that the Debtors continue to be insured under the policies. The Club would like the Movants to seek by declaratory judgment action a determination of the parties' respective rights under the policies, which the Club points out must be filed in the Southern District of New York, and must be preceded by the Movants' prior exhaustion of their contractual remedies with the Club's Board of Directors.

The Club would understandably prefer that the issues between it and the Debtors were resolved in its forum of choice under its Rules. However, the Club voluntarily entered into the policy contracts at issue here with chapter 11 debtors. Even if the contracts had been entered into pre-petition, the parties' rights in those contracts are inherently subject to the provisions of applicable law, including the Bankruptcy Code. All of the Debtors' property interests are within the exclusive jurisdiction of the Bankruptcy Court pursuant to 11 U.S.C. § 541. The Club may not like it, but it is here and subject to the jurisdiction of this Court.

The Club has also requested that the Court "schedule an evidentiary hearing in this regard for which the testimony and attendance of witnesses can be scheduled in advance pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure." Rule 9020 provides in its entirety:

> Rule 9014 governs a motion for an order of contempt made by the United States trustee or a party in interest.

Rule 9014, which governs contested matters within bankruptcy cases, has accordingly been applicable to this Motion from the date it was filed in November 2005, some 4 months before the hearing on the Motion. Rule 9014 makes all of the Part VII discovery rules other than portions of Rule 7026 (which applies Fed.R.Civ.P. 26) automatically applicable, and the Court is authorized to invoke those excluded provisions if it chooses to do so. All of the parties' rights of discovery and for the testimony and attendance of witnesses were automatically applicable to the Motion by virtue of the provisions of Rules 9020 and 9014. The Club has had the right to take whatever discovery it wanted, and to produce the testimony of whatever witnesses it wanted. The Court assumes that the parties did not take any discovery because there really are no factual issues here, or as a result of litigation strategy.

### The Club is in contempt of this Court

■ The Club's failure to indemnify and reimburse the Plan Administrator under the liability policies is based solely and exclusively in the Club's insistence that the policies are no longer in force by virtue of the Debtors' failure to pay the Release Calls. Because it failed to file an Administrative Expense Claim, the Club is barred by the permanent injunction contained in the Confirmation Order and by virtue of the provisions of 11 U.S.C. § 1141. The Club's failure to pay the indemnity claims is, therefore, a direct and knowing violation of the provisions of the Confirmation Order. Because the Club knew of the provisions of the Confirmation Order and failed to abide by them, its actions were willful. The Court accordingly finds that the Club is in contempt of this Court. The contempt is civil in nature, not criminal.

■ The Court must therefore consider the appropriate sanction to impose. The purpose of sanctions in civil contempt situations is to coerce compliance with a court order or to compensate an injured party for losses suffered as a result of the contumacious behavior, *Hubbard v. Fleet Mortgage Co.,* 810 F.2d 778 (8th Cir.1987); *Hicks v. Pearlstein,* 785 F.2d 1077 (D.C.Cir.1986). The purpose of sanctions for civil contempt is not to punish the contemnor.

■ The most obvious sanction is to require the prompt payment by the Club of all indemnity claims which have been made by the Plan Administrator since February 20, 2005; to require the Club to continue to cooperate fully in the defense of liability claims arising from the operation of the Scheduled Vessels; and to require the Club to honor all contractual obligations it has under the policies

(including payment obligations), without regard to the Debtors' non-payment of Release Calls, whose enforceability has heretofore been permanently enjoined. Because it is not clear from the record whether the parties are in agreement as to the exact dollar amount of indemnity claims, the Court will order the Club to pay forthwith those indemnity claims to which it has no good faith objection, without regard to the non-payment of Release Calls. The Court will further direct the parties to meet in an attempt to reach agreement on the total balance of indemnity claims, will invite the Movants and the Club to advise the Court of any other or additional sanctions (including attorneys' fees and costs) which they believe would be appropriate additional sanction designed to compensate the Movants, and will direct the parties to appear and to advise the Court of the status of the payment of indemnity claims and to argue as to the propriety of modified or additional sanctions.

Based upon the foregoing, it is ORDERED:

1. The Motion is GRANTED.

2. The American Club is hereby held to be in contempt of this Court by virtue of its knowing and willful violation of the terms of the permanent injunction contained in the Confirmation Order.

3. The American Club may purge its contempt on a preliminary basis by the payment of all outstanding claims for indemnification made by the Debtors or the Plan Administrator since February 20, 2005, as to which the American Club has *no good faith objection* (other than arising under its contention that the policies are unenforceable by virtue of the Debtors' failure to pay Release Calls). The Club shall make payment of all such claims to Jeffrey H. Beck, Plan Administrator, within ten days of the date of this Order.

4. The American Club is DIRECTED to honor and continue to honor all contractual obligations it has under the policies (including payment obligations), without regard to the Debtors' non-payment of Release Calls.

5. The parties are DIRECTED to meet within ten days of the date of this Order and to negotiate in good faith regarding the outstanding indemnification claims and to reach such agreements as are possible regarding accounting and any other issues.

6. The parties are INVITED to file such pleadings as they deem appropriate on the subject of modification or additions to the sanctions hereby imposed so that the full sanctions ultimately imposed by the Court operate fully to coerce the American Club to comply with the Confirmation Order and to compensate the Movants. Such pleadings, if any, are to be filed and served on or before May 15, 2006.

7. The parties are DIRECTED to appear before the Court on May 22, 2006, at 1:30 p.m. in Courtroom 308, United States Courthouse, 299 East Broward Boulevard, Ft. Lauderdale, FL 33301, and to advise the Court of the status of payments and the results of their mandatory conference, and to advise the Court as to any modifications or additions to the sanctions hereby imposed they believe should be included in the ultimate sanctions award made by the Court. The Court will consider any timely filed motions under Rule 9023 or 9024 at that hearing.