# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2024

Lyle W. Cayce
Clerk

No. 23-30040

IN THE MATTER OF GERMAN PELLETS LOUISIANA, L.L.C.;
LOUISIANA PELLETS, INCORPORATED,

*Debtors*,

RAYMOND JAMES & ASSOCIATES, INCORPORATED; GEORGE
LONGO; DANYAL SATTAR,

*Appellants*,

*versus*

CRAIG JALBERT,

*Appellee*.

───────────────────────

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:22-CV-5050

───────────────────────

Before KING, WILLETT, and DOUGLAS, *Circuit Judges*.

DANA M. DOUGLAS, *Circuit Judge*:

No. 23-30040

Louisiana Pellets (LAP)[1] built a wood processing facility with hopes of mass-producing fuel pellets. Hope turned to disappointment when financial challenges caused the entity to close shop and file for bankruptcy just months after its manufacturing began. LAP's bankruptcy process culminated in a Chapter 11 confirmation plan that transferred its remaining assets into a liquidation trust managed by the appointed trustee, Craig Jalbert. A year after the trust's creation, third parties assigned certain legal claims to the trust that Jalbert pursued in state court. The claims involved misstatements made by another party, Raymond James & Associates, as it helped raise funds to construct LAP's facility.

In response to Jalbert's filing, Raymond James asserted affirmative defenses, citing a pre-bankruptcy indemnity agreement it made with LAP. The issue in this case is whether Raymond James may maintain those defenses against the assigned claims. The answer, in short, is no: The express language of the confirmation plan enjoined Raymond James's defensive maneuver. And, in any event, the post-confirmation trust is the wrong entity against whom to invoke LAP's indemnity obligation. On these grounds, we AFFIRM the bankruptcy court's ruling.

I

The Constitution gives Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. With that authority, Congress created the Bankruptcy Code, which provides a framework for debtors to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life

---

[1] Though this case involves several parties, including LAP's affiliated entity, German Pellets, this opinion refers to the Appellees as "LAP" and the Appellants as "Raymond James" for clarity.

with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). To achieve those objectives, the Code establishes formal debt-discharging procedures, organized in Chapters that include the provisions, case administration processes, and categorization of relevant parties and entities involved in bankruptcy. *See* 11 U.S.C. §§ 101–1532.

Some Chapters are specific to the type of debtor seeking bankruptcy. Chapter 11, for example, is "intended primarily for the use of business debtors," *Toibb v. Radloff*, 501 U.S. 157, 166 (1991), and is the Chapter at issue in this case. Chapter 11 proceedings usually begin with a petition filed in bankruptcy court. 11 U.S.C. § 301(a). One perk of filing the petition is the "automatic stay" that insulates the debtor from a range of headaches, like lawsuits filed by creditors seeking to recover debts. *Id.* § 362. With outside litigation on pause, stakeholders take part in creating a Chapter 11 plan—a fundamental feature of Chapter 11 bankruptcies. *See id.* §§ 1121–29. The plan "govern[s] the distribution of valuable assets from the debtor's estate and often keep[s] the business operating as a going concern." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017). Creditors have a say in the plan's development, as they typically seek to maximize the order and amount of payment they receive. *See* 11 U.S.C. § 1123.

A plan is accepted when creditors "hold[ing] at least two-thirds in amount and more than one-half in number of the allowed claims of such class" vote in its favor. *See id.* § 1126(c). After a successful vote, the plan is then passed to the bankruptcy judge for "confirmation"—the final step in the approval process. *Id.* § 1129. The judge, for her part, ensures that the plan meets several requirements outlined in the Bankruptcy Code, and then signs a confirmation order—essentially a judgment that binds all interested parties to the plan's terms. *See id.* §§ 524, 1129, 1141.

No. 23-30040

While these plans often provide a roadmap that helps companies continue business operations, not all entities come out of Chapter 11 intact. In those cases, a liquidating trust is often created to pool the debtor's remaining assets and administer those assets as provided for by the plan. *Id.* § 1123(b)(4) ("[A] plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."). Those who manage these liquidation trusts (trustees) may pursue litigation, asserting the residual rights from the debtor's former estate. *Id.* § 1123(b)(3)(B) (explaining that residual claims from the defunct estate may be enforced "by the debtor, by the trustee, or by a representative of the estate appointed for such purpose"). Any recovery from these lawsuits is usually placed back in the trust and distributed to the trust's beneficiaries according to the plan's terms. *See id.* § 1141.

## II

With these fundamentals in mind, we now turn to the facts giving rise to the bankruptcy at issue.

## A

In a rural north Louisiana town, LAP sought to build a multi-million-dollar wood processing facility capable of refining raw wood into specialized fuel pellets. Constructing the facility required substantial capital, and to fund the enterprise, LAP sold 300 million dollars in bonds through a public financing authority.[2] Perhaps encouraged by the plant's potential, Raymond James purchased those bonds and resold them to other investors. Accompanying the sales were bond-offering memoranda, detailing the project's financial viability. To protect its representations in these

---

[2] This entity was the Louisiana Public Facility Authority.

memoranda, Raymond James entered into bond-issuing agreements with LAP, requiring LAP to indemnify Raymond James for loss resulting from "any untrue statement or misleading statement of material fact" within the memoranda.

Though bond sales provided the necessary funds to build the project, LAP quickly encountered financial problems, demanding the abrupt cessation of its facility's operations. Bond default soon followed, and the resulting monetary strains caused LAP to pursue Chapter 11 bankruptcy.

After more than a year of undergoing the bankruptcy process, a bankruptcy judge confirmed a Chapter 11 plan and a corresponding liquidating trust agreement. Under the agreement, LAP transferred its remaining assets and causes of actions to the trust. It did so with the understanding that, if there were recoveries, the appointed trustee, Craig Jalbert, would distribute them to the trust's beneficiaries.

Meanwhile, Raymond James observed these Chapter 11 proceedings from afar; it "monitored the docket" and even communicated with LAP's counsel throughout the process. Despite its knowledge of the proceedings, however, it never participated in LAP's bankruptcy.

B

Unsurprisingly, some of the biggest losers in LAP's bankruptcy were the bondholders who purchased the millions of dollars' worth of bonds from Raymond James. Yet despite their lost investment, they had at least one unaffected means of legal recourse: The bondholders could file suit against Raymond James for its alleged misstatements regarding the bond sales. But rather than file multiple actions independently, the bondholders assigned "all claims, demands, and causes of action" stemming from misstatements in the bond-offering memoranda to Jalbert's post-confirmation trust more than a year after its creation.

No. 23-30040

With these assignments in hand, Jalbert filed suit against Raymond James in Louisiana state court, alleging violations of state securities laws. In response, Raymond James filed a counterclaim against Jalbert. Citing the indemnity clause in the bond-issuing agreement it made with LAP, Raymond James argued it was entitled "to [c]ompensation . . . recoupment[,] and setoff."[3]

But Jalbert believed that Raymond James was prohibited from asserting those defenses. For one thing, Jalbert said that doing so conflicted with the express language in the bankruptcy confirmation order, which was binding in his view. By its terms, the order "permanently enjoined" "all persons who have held . . . a debt, Claim or Interest . . . from . . . asserting any setoff, right of subrogation, surcharge, or recoupment of any kind against any obligation due the Debtors." Additionally, Jalbert said that the trust and LAP were separate entities. And even though the trust subsumed LAP's legal claims, Jalbert reasoned that the trust did not subsume LAP's liabilities. According to Jalbert, this meant that the trust was the wrong party against whom to raise LAP's indemnity obligation. Noting these issues, Jalbert filed an adversary proceeding in bankruptcy court and moved for declaratory relief through summary judgment.

Raymond James opposed that motion and filed two of its own—one for summary judgment and one for relief from the confirmation order under Federal Rule of Civil Procedure 60(b). It argued that the provisions of the confirmation order did not apply under these specific circumstances and that the bankruptcy plan was either invalid, inequitable, or both. According to

---

[3] A setoff is "[a] defendant's counterdemand against a plaintiff, arising out of a transaction independent of a plaintiff's claim" or "[a] debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor." *Setoff*, BLACK'S LAW DICTIONARY 1581 (10th ed. 2014).

No. 23-30040

Raymond James, it never would have known that the bondholders would assign their claims to the post-confirmation trust, so it believed the plan's relevant terms were unenforceable. It further argued that it had a right to assert defenses to limit or reduce any recovery based on the bond sales.

After conducting a hearing, the bankruptcy court agreed with Jalbert. To that end, the court enforced the confirmation order against Raymond James as written, refused to allow Raymond James to invoke affirmative defenses against Jalbert based on LAP's indemnity obligation, and declined amending the confirmation order under Rule 60(b). Following this ruling, Raymond James appealed to the district court, but to no avail: The district judge affirmed the bankruptcy court's conclusions in all respects. Raymond James again appeals.

## III

Under the bankruptcy appeals process, we are the second level of appellate review, though we perform the same task as the district court. *In re U.S. Abatement Corp.*, 79 F.3d 393, 397 (5th Cir. 1996). Accordingly, we review the bankruptcy court's summary judgment ruling de novo. *In re Shcolnik*, 670 F.3d 624, 627 (5th Cir. 2012). Granting summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Determining whether the confirmation plan prevents Raymond James from asserting its defenses requires us to consider two legal questions. As a threshold matter, we must first address whether the confirmation plan applies to Raymond James. If it does, the next question asks whether the plan discharges the defenses Raymond James is attempting to assert against Jalbert.

A

We start by asking whether the plan applies to Raymond James. In Raymond James's view, the answer is no. It contends that it never received notice when LAP filed its petition in bankruptcy court. And without such notice, Raymond James says that it is not subject to the plan's terms.

It is true that the debtor has a general obligation to list its creditors when first filing a bankruptcy petition; the debtor's failure to do so typically means the unlisted creditor's claims are exempt from discharge. 11 U.S.C. § 523(a)(3). There is, however, a catch: If an interested party has "notice or actual knowledge" of the bankruptcy, that party must "come forward and protect their enhanced rights . . . or else lose their rights through the sweeping discharge of Chapter 11." *In re Christopher*, 28 F.3d 512, 515, 519 (5th Cir. 1994). In this context, the "notice requirement is satisfied when the creditor has actual knowledge of the case in time to permit [it] to take steps to protect [its] rights." *In re Sam*, 894 F.2d 778, 781 (5th Cir. 1990).

Here, no one disputes that LAP failed to list Raymond James as a creditor when it filed its bankruptcy petition. Although such an omission would usually preserve Raymond James's pre-bankruptcy indemnity rights, 11 U.S.C. § 523(a)(3), Raymond James had "actual knowledge" of the bankruptcy case: It monitored the case's progression from its commencement and even communicated with LAP's counsel. Under our precedent, that knowledge obligated Raymond James to come forward with its indemnity claim. *See In re Christopher*, 28 F.3d at 518. But it never did; Raymond James chose not to assert any rights it had against LAP during the company's bankruptcy proceedings. Nor did Raymond James object to the plan's provisions that threatened to extinguish its pre-petition rights.

Raymond James explains that it never could have known that the bondholders would have assigned their rights to Jalbert. In essence, its theory

is this: The indemnity rights against LAP are defensive and dependent upon the bondholders filing suit; thus, they were contingent and unliquidated when LAP filed for bankruptcy. Raymond James reasons that it could not have predicted that the bondholders would assign their claims to the post-confirmation trust after the bankruptcy was complete. And because the bondholders never filed suit before or during the pendency of LAP's bankruptcy, Raymond James says that it was unaware that filing proof of claim was required. In its view, enforcing the plan with the benefit of hindsight is inequitable and unjust.

But as the bankruptcy court observed, Raymond James's "indemnity claims did not spring into existence only when the Bondholders assigned their own claims to the Liquidating Trustee"; "[t]hey arose pre-petition, and any reasonable party . . . should have acted to protect its claims once the Debtors filed for bankruptcy." Raymond James, the court continued, is a sophisticated financial service firm and was aware of its litigation risks upon the filing of LAP's bankruptcy and the "potential exposure to liability resulting from its assistance in the issuance and sale of bonds that later become illiquid."

We agree, and on these grounds and those above, resolve the first dispute with relative ease: Even though LAP failed to list Raymond James as a creditor when it filed for bankruptcy, Raymond James is nevertheless subject to the confirmation plan because of its actual knowledge of the underlying proceedings.

B

Having concluded that the confirmation plan applies, our next question is whether its provisions discharge the types of pre-petition claims Raymond James is asserting against Jalbert. The plan, by its terms, permanently enjoins "all persons who have held, currently hold or may hold

a debt" from "asserting any setoff, right of subrogation, surcharge, or recoupment of any kind against any obligation due the Debtors, the Reorganized Debtors, the Purchaser, their successors, heirs, executors, administrators, or assigns or their respective properties."

In its response to Jalbert's lawsuit in state court, Raymond James expressly sought "recoupment and setoff" based on LAP's pre-bankruptcy indemnity obligations. Those are the types of claims the confirmation plan expressly prohibits, and several bankruptcy courts have concluded that such bars are binding and enforceable when included in a confirmation plan. *See, e.g.*, *In re Lykes Bros. S.S. Co.*, 217 B.R. 304, 311 (Bankr. M.D. Fla. 1997) ("[I]n accordance with the provisions of the confirmed Plan, the Government is precluded from asserting its setoff rights."); *Daewoo Int'l (Am.) Corp. Creditor Tr. v. SSTS Am. Corp.*, No. 02 CIV. 9629 (NRB), 2003 WL 21355214, at *5 (S.D.N.Y. June 11, 2003) (enforcing a "confirmed plan of reorganization" that "included a specific prohibition on the assertion of setoff or recoupment claims."); *In re SunCruz Casinos LLC*, 342 B.R. 370, 381 (Bankr. S.D. Fla. 2006) ("[T]he Plan expressly prohibits the assertion of any setoff or recoupment rights, [and] the Court finds that such a provision is binding on creditors and parties in interest to the case . . . .").

Raymond James, for its part, does not point to any divergent authority. And absent any reason suggesting otherwise, we are unpersuaded that we should (or could) make an exception to the plan's express prohibitions.

## IV

But Raymond James argues that even if the plan is enforceable, the bankruptcy court abused its discretion by refusing to modify the plan under Federal Rule of Civil Procedure 60(b). This Rule permits a court to relieve a party or its legal representative from a final judgment, order, or proceeding in certain situations or for any "reason that justifies relief." *Id.* When

reviewing such rulings, we defer "to the sound discretion of the [bankruptcy court]," and set aside denials for "abuse of . . . discretion." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981).

In seeking relief below, Raymond James cited 11 U.S.C. § 1127(b), which provides, in part,

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.

Raymond James argued that, while § 1127 does not specifically provide for modification after substantial consummation (which occurred here), nothing in § 1127 expressly prohibits a party from seeking relief from a confirmation order under Rule 60(b). According to Raymond James, that is why Rule 60(b) is the appropriate vehicle to seek a rewrite of the confirmation plan. As noted above, Raymond James says it could not have anticipated that Jalbert would obtain the bondholders' assignments. So even if it is subject to the plan and it terms apply, it asked the court to make an exception in the interests of fairness.

After the bankruptcy court's "own study of § 1127's plain language," however, it declined to modify the confirmation plan. It concluded that Raymond James is "likely barred from seeking [such] relief under Rule 60(b)." And even if it could, the court believed granting the Rule 60(b) motion was inappropriate. In reaching its conclusion, the court focused on Raymond James's actual knowledge of the bankruptcy proceedings. As explained, Raymond James was "fully aware of the bankruptcy case but failed to participate." The bankruptcy judge, for that reason, refused to "roll back the clock" and allow Raymond James a second bite at the apple. Such a conclusion is not "unwarranted" for the reasons expressed by the

bankruptcy court and those discussed above. We thus conclude the bankruptcy judge did not abuse its discretion in denying Raymond James's Rule 60(b) motion.

V

Raymond James alternatively asserts that the plan's language is invalid based on a litany of theories rooted in the Bankruptcy Code. But addressing these arguments would be a futile exercise, as Raymond James cannot overcome one legal obstacle precluding its desired result: Even if Raymond James could show that the terms of the confirmation plan were invalid, the trust is not the appropriate party against whom to raise its setoff defenses. As explained, the claims Jalbert lodged against Raymond James were not residual causes of action transferred from LAP's estate; Jalbert's right to assert these claims arose solely from the third-party assignments post-confirmation. Raymond James's setoff defense, by contrast, only existed vis-à-vis LAP. Raymond James is thus invoking a defunct debtor's obligation to defend against third-party allegations. Such a maneuver in most other cases would be barred.[4] And had the bondholders independently litigated their claims pre-bankruptcy, it is doubtful Raymond James could respond with the affirmative defenses it attempts to invoke now.

Raymond James counters that the situation here is unique, claiming that the post-confirmation trust "stands in the shoes" of LAP's estate. Raymond James reasons that co-mingling the assets of LAP's former estate

---

[4] As the district court observed, Raymond James readily acknowledges that it "would not have rights of setoff against the bondholders if the bondholders had sued directly and had the assignment of the bondholders' claims against Raymond James to the Liquidating Trustee not occurred. . . . And such would remain to be the case even if Raymond James' indemnity rights against the Debtors had not been discharged by the Bankruptcy Plan . . . ."

with the bondholder's assigned claims creates a situation where the trust is acting in the place of the defunct debtor. It goes on to explain that LAP's indemnity obligations and the sales of the bonds are part of the same transaction for purposes of its recoupment. For that reason, Raymond James believes that this court should allow it to raise these claims in a defensive posture.

Raymond James's argument has a few flaws. To begin with, the express language of the agreement that created Jalbert's post-confirmation trust stated that the "Liquidating Trust shall have a separate existence from the Debtors"; it was not created to serve as "successor-in-interest of the Debtors for any purpose" except as provided in the plan. Beyond this clear intent to keep the trust and the defunct debtor separate, Raymond James faces another legal impediment: our binding precedent.

We have held in other cases that post-confirmation entities and the debtor's estate are distinct. We made this principle clear in *In re United Operating, LLC*, 540 F.3d 351, 356 (5th Cir. 2008), a case involving a bankrupt company that similarly liquidated its assets under Chapter 11. After confirmation in *United Operating*, the post-confirmation entity brought an action against a creditor and several other defendants, arguing that they mismanaged the company's properties during bankruptcy. But because these causes of action were not preserved in the plan, we reasoned that the post-confirmation entity had "no standing." *Id.* In so holding, we explained that the debtor's estate "ceased to exist" upon confirmation. *Id.* at 355. Such an outcome, we believed, underscored the logical consequence of bankruptcy: securing the "prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *Id.* (quoting *In re Kroh Bros. Dev. Co.*, 100 B.R. 487, 495 (Bankr. W.D. Mo.1989)); *see also In re Palmaz Sci., Inc.*, No. 16-50552-CAG, 2018 WL 3343597, at *11 (Bankr. W.D. Tex. June 4,

2018) ("[T]he *United Operating* opinion recognizes that the debtor, debtor in possession, and the post-confirmation entity are all separate entities.").

Raymond James acknowledges that authority and the language establishing Jalbert's trust but argues that applying both in this case results in a fundamentally unfair outcome—one the United States Supreme Court sought to prevent in *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972). *Caplin* concerned whether an appointed bankruptcy trustee could pursue claims belonging to creditors on behalf of a bankruptcy estate transferred by a judge. The Supreme Court held that the trustee was unable to do so, citing three reasons for its conclusion. *Id.* at 428–34; *see also Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 901–02 (7th Cir. 2010) (analyzing these three reasons in detail). First, it reasoned that statutory authority delineated the bankruptcy trustee's powers and lacked provisions allowing bankruptcy judges to transfer third-party claims to trustees. *See Caplin*, 406 U.S. at 428–29. Second, the Court was concerned that, by pursuing third-party claims without assignment, any recovery may create a right of subrogation for anything the trustee recovered. *See id.* at 429–31. And finally, the *Caplin* Court was worried about double recoveries for the claims "placed in the trustee's hands by the judge rather than by the claims' owners." *Grede*, 598 F.3d at 902; *see Caplin*, 406 U.S. at 431–34.

By receiving and pursuing creditors' claims post-confirmation, Raymond James contends that Jalbert circumvented *Caplin* with a procedural sleight-of-hand. Permitting such a ploy, Raymond James believes, is not only unjust but contrary to law.

Yet, no matter how Raymond James frames it, "*Caplin* does not apply to the activities of a liquidating trust created by a plan of reorganization." *Grede*, 598 F.3d at 903. Importantly, the bondholders here voluntarily assigned their claims to Jalbert. And unlike those in *Caplin*, LAP's

bankruptcy proceedings concluded before the trust lodged the assigned claims against Raymond James. *Id.* Most importantly of all, this case presents none of the concerns the *Caplin* court raised. Here, for instance, the trust agreement, rather than the Bankruptcy Code, governs Jalbert's duties and powers; no one raises the issue of subrogation; and there is no possibility of a double recovery, for Jalbert holds the exclusive right to pursue the assigned claims.

This is all to say that *Caplin* does not prevent Jalbert from asserting the bondholder's assigned claims against Raymond James. If Raymond James had objections to Jalbert's ability to accept third-party assignments, it could have raised those concerns as LAP developed its bankruptcy plan; raising them now, several years post-confirmation, is too little too late.

## VI

In sum, we refuse to rewrite the confirmation plan, which applies to Raymond James and bars the defenses it is attempting to invoke in state court against Jalbert. Even if Raymond James was not subject to the plan, LAP no longer exists, and neither the bondholders nor post-confirmation entity are its successors-in-interest. On these facts, Jalbert need not shoulder LAP's liabilities and Raymond James is precluded from invoking them defensively.

AFFIRMED