T.C. Memo. 2012-143

UNITED STATES TAX COURT

EVERETT ASSOCIATES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26685-07L.                          Filed May 17, 2012.

Donald F. Payne (an officer), for petitioner.

<u>James A. Whitten</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Pursuant to section 6330(d),[1] petitioner seeks review of a

notice of determination sustaining respondent's proposed levy.  Respondent's

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue
Code (Code) in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

collection activity stems from alleged deficiencies in petitioner's employment taxes.[2]

Petitioner challenges the propriety of respondent's collection actions by asserting, primarily, that respondent received and retained a portion of a cash distribution in violation of the express terms of petitioner's chapter 11 bankruptcy plan. The improperly collected portion of the cash distribution, petitioner submits, should be refunded. Petitioner also contests the underlying tax liabilities, including all assessments of penalties and interest, for two periods listed on the notice of determination (Form 941, Employer's Quarterly Federal Tax Return, for the quarter ended June 30, 2000, and Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, for the year ended December 31, 2001), and one tax period not listed on the notice of determination (Form 941 for the quarter ended March 31, 2000).

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are incorporated herein by reference. Petitioner is a corporation with its principal place of business in California. Petitioner filed a voluntary petition for relief under chapter 11 of the

---

[2]For convenience, we use the term "employment tax" to refer to taxes under the Federal Insurance Contributions Act (FICA), secs. 3101-3125, the Federal Unemployment Tax Act (FUTA), secs. 3301-3311, and Federal income tax withholding, secs. 3401-3406 and 3509.

United States Bankruptcy Code[3] on November 9, 2001, in the Bankruptcy Court for the Northern District of California (bankruptcy court). Respondent subsequently filed a proof of claim which included a secured claim of $51,873.80, an unsecured priority claim (priority claim) of $130,239.07, and an unsecured general claim of $41,226.40. The composition of the secured and priority claims was as follows:

| Claim | Type of tax | Period (Ending) | Tax due | Penalty to bankruptcy petition date | Interest to bankruptcy petition date | Total |
|---|---|---|---|---|---|---|
| Secured | WT-FICA, Form 941 | 3/31/00 | $26,436.90 | $12,251.57 | $13,185.33 | $51,873.80 |
| Priority | FUTA, Form 940 | 12/31/99 | 1,933.64 | - 0 - | 543.49 | 2,477.13 |
| | WT-FICA, Form 941 | 06/30/00 | 75,436.67 | - 0 - | 10,487.19 | 85,923.86 |
| | WT-FICA, Form 941 | 12/31/00 | 31,907.88 | - 0 - | 2,380.74 | 34,288.62 |
| | WT-FICA, Form 941 | 03/31/01 | 2,915.01 | - 0 - | 256.29 | 3,171.30 |
| | FUTA, Form 940 | 12/31/01 | 4,009.16 | - 0 - | 369.00 | 4,378.16 |

The general unsecured claim consisted of penalties (including interest thereon), as of the petition date, on respondent's unsecured priority claims.

---

[3]Most of the references to the Bankruptcy Code refer to the provisions of 11 U.S.C. as in effect during the pendency of petitioner's bankruptcy case.

As part of its bankruptcy case, petitioner developed a chapter 11 plan (bankruptcy plan or plan) which was confirmed on February 24, 2003. The bankruptcy plan generally provided for the liquidation of some of petitioner's assets. Nonetheless, the plan also contemplated that petitioner would continue its business and use its gross receipts to satisfy certain creditors' claims.

Pursuant to article 7.04 of the plan, petitioner would sell an unimproved lot located in Santa Rosa, California (Santa Rosa lot), and use the proceeds to satisfy the claims of the secured creditors with liens on the property. Article 5.02 of the plan further provides that respondent's secured claim would be "paid in full, together with interest as provided by law." Similarly, article 5.01 of petitioner's plan provides that priority claims would be "paid in full and in the order of priority set forth in 11 U.S.C. Section 507(a)" following the liquidation of certain assets. Article 9.01 of the plan also discharges petitioner from debts on confirmation. The plan expressly provides that the bankruptcy court retained jurisdiction to determine objections to claims brought by the debtor or any other party in interest.

The "effective date" of the plan was defined as 30 days following confirmation, which was March 26, 2003. Petitioner filed an application for entry of final order with the bankruptcy court on February 8, 2005. The bankruptcy

court approved the application the following day, and petitioner's bankruptcy case was closed on March 3, 2005.

During the pendency of its bankruptcy case, petitioner did not object to nor move to value respondent's proof of claim. Since the close of its bankruptcy case, petitioner has not moved to reopen the case nor filed any action to recover money respondent received from the sale of property pursuant to the bankruptcy plan.

Petitioner submits the sale of the lot was diligently pursued but delayed several times because of circumstances beyond its control. As asserted by petitioner, the Santa Rosa lot was originally to be sold for a negotiated price of $165,000. When that sale did not materialize, petitioner allegedly received two subsequent bids for the lot of $185,000 and $225,000. These purported bids never resulted in a completed sale. Eventually, the holder of the senior note and deed of trust[4] on the lot, Ona Roth used powers pursuant to the deed of trust to cause a trustee's sale of the property. At the foreclosure sale, in December 2006, the lot was sold for over $260,000.

As a result of the December 2006 sale, Ms. Roth had her secured claim paid in full. The remainder of the sale proceeds, $125,953.63, was thereafter delivered

---

[4]Respondent held a junior lien on the property throughout the period at issue.

to respondent on December 29, 2006. Respondent applied $112,262.33 to the tax period for the quarter ended March 31, 2000 (a secured tax period), and $13,691.30 to the tax period for the quarter ended June 30, 2000 (an unsecured tax period).

Respondent asserts that, at some point before November 21, 2006, petitioner defaulted on its bankruptcy plan. On November 21, 2006, respondent issued a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing (NIL), to petitioner advising that respondent intended to levy and collect the following unpaid tax liabilities:

| Period (Ending) | Form | Balance due as of 12/21/2006 |
|---|---|---|
| 6/30/00 | 941 | $43,286.11 |
| 3/31/02 | 941 | 1,835.11 |
| 6/30/02 | 941 | 1,214.93 |
| 9/30/02 | 941 | 1,223.74 |
| 12/31/01 | 940 | 2,774.87 |
| 12/31/02 | 940 | 1,439.89 |
| Total | | 51,774.65 |

Petitioner timely requested a hearing with respondent on November 30, 2006. In its request, petitioner argued that respondent should abate penalties for failure to

use the Electronic Federal Tax Payment System (EFTPS) and failure to timely make

Federal tax deposits. Petitioner also generally contested interest assessments on

respondent's claims. In addition, petitioner asserted that respondent collected more

proceeds from the sale of the Santa Rosa lot than allowed pursuant to petitioner's

bankruptcy plan.

Petitioner actively participated in its collection due process hearing (CDP

hearing). After a period of correspondence, respondent abated the following

penalties:

| Form | Period (Ending) | Penalty abated | Amount |
|------|------|------|------|
| 941 | 3/31/00 | Failure to pay | $5,706.75 |
| 941 | 6/30/00 | Failure to pay | 7,265.85 |
| 941 | 3/31/02 | Failure to deposit | 1,535.57 |
| 941 | 6/30/02 | Failure to deposit | 924.03 |
| 941 | 9/30/02 | Failure to deposit | 973.29 |
| 941 | 12/31/02 | Failure to deposit | 920.41 |

On October 19, 2007, respondent's Appeals Office issued its notice of

determination (NOD) to petitioner. The NOD listed the following tax periods and

balances due:[5]

---

[5]Respondent's NOD notes that "net outcome", which provided for the

(continued...)

| Form | Period (Ending) | Balance due as of 10/30/07 |
|------|-----------------|----------------------------|
| 941 | 6/30/00 | $6,682.88 |
| 941 | 3/31/02 | 0.00 |
| 941 | 6/30/02 | 38.99 |
| 941 | 9/30/02 | 0.00 |
| 940 | 12/31/01 | 2,900.62 |
| 940 | 12/31/02 | 0.00 |
| Total | | 9,622.49 |

In the Appeals case memorandum attached to the NOD the Appeals officer asserted that petitioner raised "only one issue" in the CDP hearing: the failure of respondent to grant penalty relief. The Appeals officer concluded that petitioner was entitled to relief under sections 6656 and 6651 for certain failure to deposit and failure to pay penalties. Concerning the failure to pay penalties, the Appeals officer decided that petitioner was entitled to relief "because the taxpayer was asserted [sic] the * * * [penalty] for periods during which the taxpayer's bankruptcy case was pending and in direct violation of the U.S. Bankruptcy Laws."

---

[5](...continued)
reduced balances due, was "not entirely as a result of the granting of penalty relief."

The Appeals officer also determined that petitioner was not entitled to relief under section 6330 from the proposed levy action because petitioner "failed to fully participate in the Collection Due Process Hearing."[6]

Petitioner timely filed a petition with this Court on November 20, 2007, contesting respondent's determination to sustain the proposed levy. Petitioner attached respondent's NOD to the petition but specifically requested that the Court review Appeals' determination for the Forms 941 for the quarters ended March 31, 2000 (a period not listed in respondent's NOD), and June 30, 2000, and Form 940 for the year ended December 31, 2001. In its petition, petitioner cites several alleged errors made by respondent in his determination:

> 1. Settlement Officer * * * was unsure of the effect of Bankruptcy law, as it related to application of FTP and FTD penalties. * * * [The settlement officer] refused to accept any additional written argument and did not therefor consider the effect of multiple interperiod transfers on the net balance claimed.
>
> 2. The IRS has collected $41,226.44 plus accrued interest and FTP/FTD penalties for their unsecured general claim in the Chapter 11, ahead of other higher priority creditors.
>
> 3. Other non-pecuniary loss penalties have been collected by lien and levy. ... [sic] contra 507(a) of Code.

_____

[6]At trial respondent's Appeals officer testified that he asked petitioner to stop sending additional letters to respondent during the CDP process. This was requested "Because their letters * * * were very lengthy, multiple pages, and they tend to focus on bankruptcy. That's not something that I can consider."

4. * * * [The settlement officer] confined his final assessment only to FTP and FTD issues that showed as still outstanding amounts, and was unwilling to address a credit for amounts over-collected, by lien and levy, and contrary to Bankruptcy Law.

5. * * * [The settlement officer] wanted to get the case closed, without addressing the above substantial issues that became evident. The Chapter 11 was closed in 2005, and there is no other forum to address the overcollected amounts.

The tax periods listed on respondent's proof of claim and those listed in the NOD share only two tax periods in common--the Form 941 for the quarter ended June 30, 2000, and the Form 940 for the year ended December 31, 2001.

On October 20, 2008, respondent filed a motion to dismiss as to the employment tax periods ended March 31 and September 30, 2002, and for the year ended December 31, 2002, as moot on the grounds that the tax liabilities for those periods had been paid in full and the proposed levy was no longer necessary. On August 7, 2009, respondent's motion was granted.

This case was tried on March 7 and 17, 2011, in San Francisco, California.[7]

OPINION

Section 6330 provides that no levy may be made on any property or right to property of a person unless the Commissioner first notifies such person in writing

---

[7]Following trial, respondent abated interest of $5,411 for petitioner's March 31, 2000, tax period because of a recognized error in his assessment.

of the right to a hearing before the Appeals Office. Sec. 6330(a). At the hearing, the taxpayer may raise any relevant issue relating to the unpaid tax or the proposed levy, including appropriate spousal defenses, challenges to the appropriateness of collection actions, and offers of collection alternatives. Sec. 6330(c)(2)(A); Sego v. Commissioner, 114 T.C. 604, 609 (2000); Goza v. Commissioner, 114 T.C. 176, 180 (2000). A taxpayer may contest the existence or amount of the underlying tax liability if the taxpayer did not receive a statutory notice of deficiency for the tax liability in question or did not otherwise have an earlier opportunity to dispute the tax liability. Sec. 6330(c)(2)(B); see also Sego v. Commissioner, 114 T.C. at 609. Following a hearing, the Appeals Office must make a determination whether the Commissioner may proceed with the proposed collection action.

We have jurisdiction to review the Appeals Office's determination. Sec. 6330(d)(1); see sec. 301.6330-1(f), Q-F3, Proced. & Admin. Regs. ("the taxpayer can only ask the court to consider an issue * * * that was properly raised in the taxpayer's CDP hearing").

Where the underlying tax liability is properly at issue, we review that determination de novo. Goza v. Commissioner, 114 T.C. at 181-182. Where the underlying tax liability is not at issue, we review the determination for an abuse of discretion. Id. at 182. Taxpayers may prove abuse of discretion by showing that

the Commissioner exercised his discretion arbitrarily, capriciously, or without sound basis in fact or law.  See Giamelli v. Commissioner, 129 T.C. 107, 111 (2007).[8]

Petitioner asserts a panoply of grievances against respondent.  The wide-ranging assertions can generally be channeled into three distinct categories:  (1) respondent improperly assessed interest before, during the pendency of, and following the close of petitioner's bankruptcy case;[9] (2) respondent improperly assessed and collected failure to pay penalties which were discharged according to

---

[8]This Court held in Robinette v. Commissioner, 123 T.C. 85, 101 (2004), rev'd, 439 F.3d 455 (8th Cir. 2006), that we are not limited to the administrative record in reviewing CDP determinations.  However, under the Golsen rule, we follow the law of the Court of Appeals for the Ninth Circuit, to which this case, absent a stipulation to the contrary, is appealable.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  That court has limited the review of the administrative determination to the administrative record (administrative record rule).  See Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009) ("our review is confined to the record at the time the Commissioner's decision was rendered"), aff'g T.C. Memo. 2006-166 (and aff'g and vacating decisions in related cases).  Nonetheless, under a de novo standard of review, we still consider all of the relevant evidence introduced at trial.  See Jordan v. Commissioner, 134 T.C. 1, 9 (2010) ("because section 6330 requires a de novo standard of review when the underlying liability is properly in issue, the administrative record rule is not applicable to such a case" (citing 5 U.S.C. sec. 554(a)(1) (2006))).

[9]Petitioner's corollary assertion is that respondent abused his discretion in failing to address petitioner's request for interest relief during its sec. 6330 hearing.

petitioner's bankruptcy plan; and (3) respondent applied petitioner's bankruptcy payments in contravention of petitioner's bankruptcy plan, entitling petitioner to a refund.

I. Nondetermination Years

The Tax Court is a court of limited jurisdiction; we may exercise jurisdiction only to the extent expressly authorized by Congress. Sec. 7422; see also Henry Randolph Consulting v. Commissioner, 112 T.C. 1, 4 (1999). Under section 6330(d)(1)(A), we have jurisdiction over the determination made by the Appeals Office, and our jurisdiction is defined by the scope of that determination. Freije v. Commissioner, 125 T.C. 14, 25 (2005).

Petitioner's petition includes a tax period not addressed in respondent's notice of intent to levy nor in the notice of determination: the tax period for the quarter ending March 31, 2000. Petitioner argues that, as a result of respondent's purportedly erroneous assessment for that period, petitioner overpaid the corresponding tax liability and the resulting credit should be applied to the balances due for the other periods validly listed on petitioner's petition. Alternatively, petitioner submits that the surplus payment resulting from the satisfaction of petitioner's tax liability for the quarter ending March 31, 2000, was applied in contravention of petitioner's confirmed bankruptcy plan to its tax period for the

quarter ending June 30, 2000. If petitioner is correct in either assertion, it will affect respondent's collection action for at least one period that petitioner appropriately listed on its Tax Court petition.[10]

We have previously considered whether we have jurisdiction to conclude that a taxpayer's liability for a determination year in a CDP case should be reduced or eliminated by recognized overpayments from nondetermination years or remittances misapplied to nondetermination years. See, e.g., Weber v. Commissioner, 138 T.C. ___ (May 7, 2012); Freije v. Commissioner, 125 T.C. at 25; see also Brady v. Commissioner, 136 T.C. 422 (2011) (holding that taxpayer was not entitled to a credit for alleged overpayment in prior years because his claims were not made within the applicable period of limitations); Landry v. Commissioner, 116 T.C. 60 (2001) (taxpayer was time barred from applying a credit arising from overpayments in nondetermination years to a tax liability addressed in a notice of determination).

---

[10]Curiously, if petitioner is correct in its alternate assertion, its underlying tax liability for the period ending June 30, 2000, might be increased. Petitioner desires this result because it assumes that respondent would correspondingly refund the amount of the overpayment to petitioner administratively, or that this Court would order a refund of that payment. Petitioner submits that it would thereafter apply the payment, in accordance with its bankruptcy plan, for the benefit of creditors with higher priority claims than respondent's.

In Freije v. Commissioner, 125 T.C. at 27, we held that "our jurisdiction under section 6330(d)(1)(A) encompasses consideration of facts and issues in nondetermination years where the facts and issues are relevant in evaluating a claim that an unpaid tax has been paid." We noted that such an inquiry "surely includes a claim * * * that the 'unpaid tax' has in fact been satisfied by a remittance that the Commissioner improperly applied elsewhere." Id. at 26. Nonetheless, we qualified that our consideration of nondetermination years in a CDP context extends only "insofar as the tax liability for that year may affect the appropriateness of the collection action for the determination year." Id. at 28.

Our recent Opinion in Weber v. Commissioner, 138 T.C. at ___ (slip op. at 25-41), clarified Freije and similar jurisprudence concerning the propriety of nondetermination tax period review in CDP cases. In Weber, the taxpayer asserted that a section 6672 penalty liability (a nondetermination liability) had been overpaid and that the overpayment should be credited to a determination-year income tax liability. Id. at ___ (slip op. at 25).[11] Rejecting the taxpayer's

_____

[11]As a preliminary inquiry, Weber v. Commissioner, 138 T.C. ___, ___ (slip op. at 26-31) (May 7, 2012) (citing Brady v. Commissioner, 136 T.C. 422, 427 (2011)), determined that the taxpayer had met the threshold requirements for refund litigation.

The timeliness of petitioner's request for a credit was not addressed by either
(continued...)

suggestion that this Court's jurisdiction fully extends into the consideration of facts

and circumstances in nondetermination years, we stated:

> An overpayment of a section 6672 penalty (or any other liability) that has been determined by the IRS or a court but has not been either refunded or applied to another liability may be an "available credit" that, under <u>Freije</u>, could be taken into account in a CDP hearing to determine whether the tax at issue remains "unpaid" and whether the IRS can proceed with collection. But a mere claim of an overpayment is not an "<u>available</u> credit" but is instead a <u>claim</u> for a credit; and such a claim need not be resolved before the IRS can proceed with collection of the liability at issue. * * * [<u>Id.</u> at ___ (slip op. at 40); emphasis supplied.]

<u>Weber</u> effectively stands for the proposition that only nonrefunded or not yet

applied "available" credits arising in nondetermination years may be considered by

this Court in determining whether a tax liability at issue has been reduced or

eliminated; until the credit has fully materialized, the taxpayer merely asserts a claim

for credit which is beyond the scope of our jurisdiction in a CDP case. <u>See id.</u> at

___ (slip op. at 31-41).

---

[11](...continued)
party. Respondent received $125,953.63 from the sale of the Santa Rosa lot on December 29, 2006, during the pendency of petitioner's CDP hearing. Thereafter, petitioner repeatedly claimed to respondent's Appeals officer, through letters, emails, and oral communication, that it was entitled to a credit for its alleged overpayment. Respondent has not disputed, and we therefore assume, that these exchanges constituted an adequate and timely informal refund claim. <u>See</u> secs. 6402(a), 6511(a).

Petitioner's primary assertion that it overpaid a tax liability for a nondetermination period, resulting in a credit which should be applied to the balances due in determination periods, would require this Court to consider, de novo, the entirety of petitioner's tax liability for the nondetermination period. Weber precludes us from engaging in such an inquiry; nonetheless, petitioner would not be entitled to an overpayment credit for the nondetermination period at issue in any event (discussed further infra). However, petitioner's alternate assertion that the surplus payment resulting from the satisfaction of petitioner's tax liability in a nondetermination period was misapplied to a determination period, appears to appropriately fit within the jurisdictional ambit of this Court established by Freije. Accordingly, we will address this contention in turn.

## II. The Underlying Tax Liabilities

During petitioner's CDP hearing, it did not dispute that it had failed to deduct and withhold certain employment taxes under sections 3111, 3301, and 3402; rather, petitioner asserted that respondent erroneously assessed interest and penalties related to its employment tax liabilities which accrued before, during the pendency of, and following its bankruptcy case. Respondent, in the NOD, granted petitioner penalty relief for some tax periods, but did not address petitioner's claims of invalid

interest assessments.  Petitioner now asks us to review both interest and penalty assessments.

In a CDP hearing, a taxpayer may raise challenges to the existence or amount of the underlying liability for any tax period only if the taxpayer did not receive any statutory notice of deficiency for the tax liability or did not otherwise have an opportunity to dispute the underlying liability.  Sec. 6330(c)(2)(B).  The term "underlying tax liability" is not defined in the Code, and guidance on the meaning of the term is not provided in the regulations.  Nonetheless, we have held that "it is reasonable to interpret the term 'underlying tax liability' as a reference to the amounts that the Commissioner assessed for a particular tax period."  Montgomery v. Commissioner, 122 T.C. 1, 7 (2004).  Generally, this will consist of amounts reported due on a taxpayer's return along with statutory interest and penalties.  Id. at 8; see also Fransen v. Commissioner, T.C. Memo. 2007-237 n.5.  Accordingly, it is within our jurisdiction to review respondent's contested interest and penalty assessments.

III.  Prior Opportunity To Dispute the Underlying Tax Liability

While this Court now maintains general jurisdiction to review all collection determinations of the Appeals Office irrespective of the type of underlying tax,[12] as noted supra, we are constrained in our review to only those liabilities for which the taxpayer has neither received a notice of deficiency nor otherwise had a prior opportunity to dispute.  Sec. 6330(c)(2)(B).

Petitioner did not receive any notice of deficiency for its employment tax liabilities concerning the tax periods at issue.  See sec. 6205(b);  Anderson v. Commissioner, T.C. Memo. 2003-112 ("[R]espondent may assess employment tax without providing taxpayers with a deficiency notice or an opportunity for a prepayment forum to dispute respondent's employment tax determination.").  Respondent also summarily assessed additional, disputed amounts of interest and

---

[12]Before the enactment of the Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 855(a), 120 Stat. at 1019, the Tax Court had jurisdiction to review an Appeals officer's determinations only in those cases where the Tax Court had jurisdiction over the underlying tax liability.  Callahan v. Commissioner, 130 T.C. 44, 47-48 (2008).  The PPA expanded our jurisdiction to include review of the Commissioner's collection activity, regardless of the type of underlying tax involved, for determinations made after October 16, 2006.  PPA sec. 855; Perkins v. Commissioner, 129 T.C. 58, 63 n.7 (2007).  The Appeals Office issued the NOD to petitioner on October 19, 2007, over 1 year after the PPA's effective date.  Accordingly, we will review petitioner's underlying tax liabilities without a jurisdictional inquiry.

penalties against petitioner on those liabilities, following the close of petitioner's bankruptcy proceedings in 2005. The record before us, therefore, makes clear that petitioner never received a notice of deficiency for the contested tax periods; however, there remains the question of whether petitioner was afforded the opportunity to contest these underlying tax liabilities.

Federal bankruptcy courts may consider the amount or legality of taxes, including penalties and interest. Bankruptcy Code sec. 505(a); Sabath v. Commissioner, T.C. Memo. 2005-222. Where a taxpayer has filed a bankruptcy action and the Commissioner has submitted a proof of claim for unpaid Federal tax liabilities in that action, we have held that the taxpayer has had the opportunity to dispute the liabilities for purposes of section 6330(c)(2)(B). See Kendricks v. Commissioner, 124 T.C. 69 (2005); Sabath v. Commissioner, T.C. Memo. 2005-222; see also Bankruptcy Code sec. 502(a) ("A claim or interest, proof of which is filed * * * is deemed allowed, unless a party in interest * * * objects.").

In petitioner's bankruptcy proceeding, respondent submitted a proof of claim, including a secured claim of $51,873.80, a priority claim of $130,239.07, and a general unsecured claim of $41,226.40, for petitioner's unpaid employment tax liabilities, including penalties and interest. Petitioner, represented by counsel, did not file an objection to these tax liabilities. Accordingly, petitioner is precluded

from challenging the underlying liabilities, including penalties and interest, as submitted by respondent in his proof of claim. See Salazar v. Commissioner, T.C. Memo. 2008-38, aff'd, 338 Fed. Appx. 75 (2d Cir. 2009).

Following the close of petitioner's bankruptcy case on March 3, 2005, respondent assessed additional interest and penalties on petitioner's unpaid employment tax liabilities arising from its March 2000, June 2000, and December 2001 quarters. Of those periods, the June and December quarters were addressed in respondent's notice of determination; only the March and June quarters were addressed in petitioner's bankruptcy case. Petitioner did not receive a notice of deficiency for any of these periods, nor was it afforded the prior opportunity to contest the liabilities during its bankruptcy case as the assessments were made after

the bankruptcy proceedings had closed.[13]  Accordingly, we will review these assessments de novo.  Goza v. Commissioner, 114 T.C. at 181-182.

In sum, petitioner may not dispute its unpaid liabilities as submitted by respondent in his proof of claim.  Our focus instead appropriately narrows to the interest and penalties which accrued on respondent's secured and priority tax claims during the pendency of petitioner's bankruptcy case and following the confirmation of petitioner's bankruptcy plan.

_____

[13]Interest that accrues on an oversecured creditor's claim is added to the claim.  Warehouse Home Furnishings Distribs. Inc. v. Gladdin (In re Gladdin), 107 B.R. 803, 806 (Bankr. M.D. Ga. 1989).  Bankruptcy law affords a debtor a mechanism to object to the creditor's claims during the pendency of its bankruptcy case.  See Fed. R. Bankr. P. 3007.  Nonetheless, petitioner was not apprised of the rate of interest accrual on respondent's secured claim until respondent assessed the interest following the close of petitioner's bankruptcy case.  Respondent did not file an amended proof of claim during the bankruptcy proceeding reflecting the accrual of interest on his secured claim, nor did he assess additional interest during the bankruptcy proceeding.  Cf.  Sabath v. Commissioner, T.C. Memo. 2005-222 (finding that the taxpayer had an opportunity to challenge the amount of interest and penalties assessed before plan confirmation).  Further, no evidence was submitted to this Court regarding whether interest accrual was addressed in a bankruptcy plan confirmation hearing.  Petitioner, instead, contends that it remained unaware of the extent of interest accrual until it received notice of assessment more than two years after the close of its bankruptcy case.  Respondent has never contested this assertion.  Accordingly, we find that, in this context, petitioner was never afforded the opportunity to contest post-bankruptcy-petition interest accrual on respondent's secured claim.

IV. <u>Post-Bankruptcy-Petition Interest on a Secured Claim Versus an Unsecured Claim</u>

Interest on a tax underpayment generally accrues from the last date prescribed for payment of the tax to the date the tax is paid. Sec. 6601(a). However, in a bankruptcy proceeding, the characterization of a creditor's prepetition claim determines whether the claim properly accrues postpetition interest. <u>See</u> <u>United States v. Victor</u>, 121 F.3d 1383, 1386-1387 (10th Cir. 1997)**.**

Prepetition claims are characterized as either secured or unsecured. Unsecured claims are further distinguished into priority claims and general unsecured claims. For a creditor to be entitled to a secured claim, the claim must be secured by a lien[14] on property to which the bankrupt estate has an interest. Bankruptcy Code sec. 506(a). Unsecured claims include those claims which are not secured by a lien on the bankrupt estate's property, as well secured claims to the extent that the amount of the claim secured by a lien exceeds the value of the encumbered property. <u>See</u> <u>id.</u> Priority claims consist of unsecured claims listed in Bankruptcy Code sec. 507. Tax claims are typically afforded eighth priority

---

[14]A Federal income tax lien includes "any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto". Sec. 6321.

according to the provision. See Bankruptcy Code sec. 507(a)(8). All remaining claims are characterized as general unsecured claims.

Bankruptcy creditors are entitled to postpetition interest only if their claim is oversecured. Bankruptcy Code sec. 506(b); United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989);[15] see also In re Kingsley, 86 B.R. 17, 18 (Bankr. D. Conn. 1988) ("As a general rule, interest on an allowed prepetition claim, other than a claim secured by property the value of which is greater than the amount of the claim, stops accruing as of the filing of the bankruptcy petition."). Postpetition interest accrues from the date of the bankruptcy filing until the payment of the secured claim or the effective date of the reorganization plan. Rake v. Wade, 508 U.S. 464, 468 (1993). A claim is secured only to the extent of the bankrupt estate's interest in the encumbered property. Bankruptcy Code sec. 506(a)(1). Claims are unsecured to the extent the value of the claim exceeds the value of the bankrupt estate's interest in the encumbered property. Id. Bankruptcy law, therefore, expressly recognizes that a creditor's claim can be bifurcated into secured and unsecured portions. See Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 961

---

[15]Before the Ron Pair Enters., Inc., decision, bankruptcy courts within the Ninth Circuit repeatedly held that secured tax liens were not entitled to postpetition interest. See In re Nevada Envtl. Landfill, 81 B.R. 55 (Bankr. D. Nev. 1987); In re Granite Lumber Co., 63 B.R. 466 (Bankr. D. Mont. 1986); In re Stack Steel & Supply Co., 28 B.R. 151 (Bankr. W.D. Wash. 1983).

(1997). The value of the encumbered property is determined "'in light of the purpose of the valuation and of the proposed disposition or use of such property'". Id. (quoting 11 U.S.C. sec. 506(a)(1)). Generally, such an assessment is based on the property's fair market value. Taffi v. United States (In re Taffi), 68 F.3d 306, 309 (9th Cir. 1995), aff'd en banc, 96 F.3d 1190 (9th Cir. 1996). The sale price of the encumbered property in a fair, arm's-length transaction, if occurring during the pendency of the bankruptcy case, is usually the best means of determining its fair market value. Romley v. Sun Nat'l Bank (In re Two S Corp.), 875 F.2d 240, 244 (9th Cir. 1989) ("Evidence of other appraised values is also irrelevant, because the sale price is a better indicator of the asset's value than any estimate of value given prior to the sale."); see also Takisake v. Alpine Grp., Inc. (In re Alpine Grp., Inc.), 151 B.R. 931, 935 (B.A.P. 9th Cir. 1993) (the sale price "is conclusive evidence of the property's value").

There remains a dispute over whether respondent's secured claim was fully secured during the period following petitioner's bankruptcy petition. The determination of the security of respondent's claim requires an inquiry into the proper fair market value of petitioner's Santa Rosa lot--the property encumbered by respondent's Federal tax lien. See 9 Collier on Bankruptcy, para. 3012.01, at 3012-2 (16th ed. 2012) ("In order to determine the value of a secured claim, the court

must determine the value of the collateral securing the claim."). Petitioner proffers that postpetition bids for the sale of the Santa Rosa lot validly evidence the property's fluctuating fair market value and that respondent's corresponding claim on the property should reflect such changes in value. Respondent counters that applicable bankruptcy rules foreclose a postbankruptcy valuation of the secured collateral by this Court and that respondent's uncontested claim in the bankruptcy proceeding serves as direct evidence that respondent's secured claim was fully secured. Alternatively, respondent contends that if we were to endeavor to determine the fair market value of the encumbered property, we should focus on its disposition value.

We agree with respondent's primary contention that bankruptcy rules, supplemented by the provisions of petitioner's self-structured bankruptcy plan, preclude our inquiry into the fair market value of the encumbered property; we need not address the parties' arguments regarding its proper valuation.

Respondent's validly executed proof of claim constitutes "prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also In re Padget, 119 B.R. 793, 798 (Bankr. D. Colo. 1990) ("[A] proper claim timely filed stands, absent objection."). If petitioner disagreed with the value of respondent's proof of claim, bankruptcy rules afforded it the opportunity to file a

motion with the court and litigate the matter. See Fed. R. Bankr. P. 3012. The obligation to file a motion to value a claim during the bankruptcy case is placed on the party desiring to reclassify the claim. See Piedmont Trust Bank v. Linkous (In re Linkous), 990 F.2d 160, 163 (4th Cir. 1993) ("A debtor should inform the secured creditor of an intent to reclassify its claim into partially secured and partially unsecured status. Placing such a responsibility with the debtor is both logical and not unduly burdensome." (Emphasis supplied.)). If a party desiring to contest a valuation fails to do so during the pendency of the bankruptcy proceedings, he is generally estopped from raising the issue at a later date. Agricredit Corp. v. Harrison (In re Harrison), 987 F.2d 677 (10th Cir. 1993) (rejecting an attempt at a postbankruptcy confirmation recharacterization of a secured claim). An order confirming a bankruptcy plan is "binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect." Trulis v. Barton, 107 F.3d 685, 691 (9th Cir. 1995). The record before us is devoid of any substantive information regarding petitioner's bankruptcy proceedings; however, respondent avers that petitioner never objected to his proof of claim, nor moved to value the claim during those proceedings. Petitioner has never disputed this assertion.

Article 8.01 of petitioner's bankruptcy plan further provided for the retained jurisdiction of the bankruptcy court to determine the validity, priority, and extent of liens. This afforded petitioner the option to contest the valuation of respondent's claim until its bankruptcy case was closed on March 3, 2005. Even after the bankruptcy court's final decree, petitioner was freely permitted to reopen the case. Bankruptcy Code sec. 350(b); Fed. R. Bankr. P. 5010. Nonetheless, petitioner chose not to pursue any of these avenues to contest respondent's proof of claim.

We will not attempt a postbankruptcy final decree valuation of respondent's claim. Indeed, even bankruptcy courts are reluctant to value claims following a plan confirmation. See In re Wilkins, 71 B.R. 665 (Bankr. N.D. Ohio 1987). "[T]he proper time for valuation is prior to Plan confirmation and not afterwards." Id. at 670. We find that, before this Court, respondent's proof of claim is dispositive evidence of its "validity and amount". See Fed. R. Bankr. P. 3001(f). Accordingly, respondent's secured claim was oversecured, thereby validly entitling respondent to postpetition interest on his secured claim.

V. Postpetition Rate of Interest on Respondent's Secured Claim[16]

As noted supra, section 6601(a) provides that if a taxpayer fails to pay a tax imposed by the Code, interest shall accrue from the date that the tax payment is due until the date it is paid. The rate of interest is "the underpayment rate established under section 6621". Id. For a "large corporate underpayment" however, this rate is increased by 2 additional percentage points. Sec. 6621(c)(1). A "large corporate underpayment" is defined as an underpayment of tax by a C corporation for any "taxable period" if the underpayment for such "taxable period" exceeds $100,000. Sec. 6621(c)(3)(A). In the case of any tax imposed by subtitle A, such as an income tax, the "taxable period" is the taxable year. Sec. 6621(c)(3)(B)(I). For all other

---

[16]Bankruptcy Code sec. 511, enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, sec. 704, 119 Stat. at 125, effective in cases commenced on or after October 17, 2005, provides:

(a) If any provision of this title requires the payment of interest on a tax claim or on an administrative expense tax, or the payment of interest to enable a creditor to receive the present value of the allowed amount of a tax claim, the rate of interest shall be the rate determined under applicable nonbankruptcy law.

(b) In the case of taxes paid under a confirmed plan under this title, the rate of interest shall be determined as of the calendar month in which the plan is confirmed.

As petitioner filed his bankruptcy petition in 2001, the section is not applicable to the case at issue.

underpayments of tax, the "taxable period" refers to the period to which the underpayment relates. Sec. 6621(c)(3)(B)(ii); see also sec. 301.6621-3(b)(4), Proced. & Admin. Regs. ("the taxable period for an underpayment of FICA taxes is the calender quarter"). The appropriate rate of tax, therefore, depends on the "taxable period" to which petitioner's employment taxes relate.

Subtitle C of the Code governs payment of employment taxes. Sections 3111 and 3301 impose taxes on employers under FICA (pertaining to Social Security) and FUTA (pertaining to unemployment), respectively, based on wages paid to employees. Similarly, section 3402 requires that employers deduct and withhold income tax on wages paid to employees. Petitioner reported each of these taxes on quarterly returns, and respondent has assessed the tax for each quarter separately. As none of these taxes are imposed by subtitle A, each of petitioner's contested taxable quarters must be viewed in isolation when determining the applicability of a "large corporate underpayment".

Respondent has vacillated over the appropriate postpetition rate of interest on his secured claim. Noting that the initial balance of the tax due for petitioner's March 2000 tax period was $118,498.30, respondent admits that he "may have initially computed and assessed interest at the large corporate underpayment rate."

Nonetheless, respondent now accepts the interest calculations of his insolvency expert which were performed during the pendency of this case. Respondent asserts that those calculations reflect an application of the general underpayment rate established under section 6621.

Bankruptcy Code sec. 506(b) does not provide a specific rate of interest for secured claims arising from nonconsensual liens such as those at issue; however, courts have repeatedly held that the rates of interest provided by otherwise applicable statutes govern. See Lapiana v. Bank of Ravenswood (In re Lapiana), 100 B.R. 998, 1004 (N.D. Ill. 1989); Gline v. Horn & Co. (In re Isley), 104 B.R. 673, 680 (Bankr. D. N.J. 1989); In re Krump, 89 B.R. 821, 825 (Bankr. S.D. 1988); Hunter v. Ohio Citizens Bank (In re Henzler Mfg. Co.), 55 B.R. 194, 197 (Bankr. N.D. Ohio 1985); In re Hoffman, 28 B.R. 503, 508 (Bankr. Md. 1983); In re Busman, 5 B.R. 332, 341 (Bankr. E.D.N.Y. 1980). Accordingly, we find respondent's assessments of postpetition interest on his secured claim in accordance with the general underpayment rate of section 6621 are valid.

VI. Postconfirmation Interest and Interest Rate on Respondent's Secured Claim

Confirmed chapter 11 plans bind the debtor and all creditors to the terms of the plan. Bankruptcy Code sec. 1141(a); In re Penrod, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994) ("The plan is essentially a new and binding contract, sanctioned by

the court, between the debtors and their pre-confirmation creditor."), aff'd, 50 F.3d 459 (7th Cir. 1995); see also Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993) (bankruptcy plans are to be interpreted under the rules governing the interpretation of contracts).

Article 5.02 of petitioner's confirmed bankruptcy plan provides that respondent's secured claim would be "paid in full, together with interest as provided by law." Respondent contends that this provision allowed for the accrual of postconfirmation interest on his secured claim at the general underpayment rate of section 6621. Petitioner generally protests all postconfirmation accrual of interest on the claim.

The express terms of petitioner's bankruptcy plan unambiguously provided that respondent's secured claim would be paid with interest. Furthermore, in the light of the qualifying language that interest would be paid as "provided by law", we find that petitioner's bankruptcy plan contemplated interest accrual on respondent's

secured claim at the general underpayment rate of section 6621.[17]  Accordingly, we conclude that such interest assessments were valid.

VII.  <u>Interest on Respondent's Priority Claim</u>

Both parties agree that priority tax claims do not accrue interest from the petition date through confirmation of the plan.  <u>See</u> Bankruptcy Code sec. 506(b).  Petitioner, however, contests the accrual of postconfirmation interest on respondent's priority claim.  Respondent counters that the bankruptcy plan provides for the deferred payment of his priority claim, entitling him to interest until the claim was paid in full.

A bankruptcy court can confirm a chapter 11 bankruptcy plan only if the plan satisfies various statutory requirements.  <u>See</u> Bankruptcy Code sec. 1129.  One such requirement, articulated in Bankruptcy Code sec. 1129(a)(9)(C),[18] is

---

[17]Petitioner cites no authority to overcome the clear language of its bankruptcy plan.  To the extent petitioner argues that the plan is ambiguous, under applicable California law, "where a contract is ambiguous, 'the language of * * * [the] contract should be interpreted most strongly against the party who caused the uncertainty to exist.'"  <u>William M. Miller v. United States</u>, 363 F.3d 999, 1006 (9th Cir. 2004) (quoting Cal. Civ. Code sec. 1654).  Consequently, even if ambiguity exists within the document, we interpret it against petitioner-drafter.  <u>See</u> <u>id.</u>

[18]Bankruptcy Code sec. 1129(a)(9)(C) provides in relevant part:

(continued...)

that, absent agreement otherwise, if the plan provides for deferred payments to a government creditor holding a priority tax claim, the plan must also entitle the creditor to "value, as of the effective date of the plan, equal to the allowed amount of such claim". Bankruptcy courts "have almost uniformly ruled that the proper method of providing such creditors with the equivalent of the value of their claim as of the effective date of the plan is to charge interest on the claim throughout the payment period." United States v. S. States Motor Inns, Inc. (In re S. States Motor Inns, Inc.), 709 F.2d 647, 650 (11th Cir. 1983); see also United States v. Neal Pharmacal Co., 789 F.2d 1283, 1285 (8th Cir. 1986) ("a debtor * * * may only defer the payment of priority tax claims if the creditor who is forced to accept the deferred

---

[18](...continued)
The court shall confirm a plan only if all the following requirements are met:

> *     *     *     *     *     *     *

> (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

> *     *     *     *     *     *     *

> (C)  with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

payments receives interest on its claim in an amount that renders the deferred payments equivalent to the present value of its claim").

Section 5.01 of petitioner's confirmed bankruptcy plan provides that respondent's priority tax claims are to be paid "in full" from the proceeds of petitioner's assets. At issue is whether that term calls for deferred payments, or alternatively, whether the plan should be interpreted to preclude the accrual of interest on respondent's claim.

Petitioner cites In re Pharmadyne Labs., Inc., 53 B.R. 517 (Bankr. D. N.J. 1985), and United States v. White Farm Equip. Co., 157 B.R. 117 (N.D. Ill. 1993), in support of its proposition that postconfirmation interest accrual on respondent's claim is unwarranted. Respondent counters by generally attempting to distinguish the present facts from those in the cases upon which petitioner relies.

What follows is a discussion of the cases cited by petitioner as well as United States v. Arrow Air, Inc. (In re Arrow Air, Inc.), 101 B.R. 332 (S.D. Fla.1989), a case cited, but not examined by respondent, and In re Collins, 184 B.R. 151 (Bankr. N.D. Fla. 1995). In these latter two cases, the respective courts held that the debtors' delayed payments to priority tax creditors entitled the creditors to interest accrual on their claims pursuant to bankruptcy plan provisions providing for the payment of those claims "in full". Consistent with these cases, we find that

petitioner's bankruptcy plan contemplated deferred payments on respondent's priority claim and that respondent was, correspondingly, entitled to accrue interest on his claim during the period following confirmation of petitioner's bankruptcy plan.

A.  Caselaw

In In re Pharmadyne Labs., Inc., 53 B.R. at 519, the debtor's chapter 11 bankruptcy plan allowed for the payment of priority tax claims "to the extent there * * * [were] funds available for payment" following the liquidation of the debtor's assets and the satisfaction, in full, of higher priority claims.  After payments were delayed, the Commissioner sought postconfirmation interest on his claims pursuant to 11 U.S.C. sec 1129(a)(9)(C); however, the court cursorily dismissed the section's applicability by finding that "The plan * * * [did] not provide for the deferment of payments to the I.R.S."  Id. at 522.  The court's decision arguably embraces the premise that the absence of any express provision in a bankruptcy plan for deferred payments serves to preclude the Commissioner from asserting entitlement to postconfirmation interest on his claim.

In White Farm Equip. Co., 157 B.R. at 118-119, the debtor's bankruptcy plan provided that certain claims would be paid the "allowed amount thereof in cash on the latter of the Effective Date or the date upon which such claims become Allowed

Claims." The plan also explicitly restricted "Allowed Claims" from accruing interest following the petition date. Id. at 119.

After the confirmation of the plan, litigation ensued concerning the proper characterization of the Commissioner's claim. At the conclusion of a series of appeals, ending with a denial of certiorari by the Supreme Court, the Commissioner's claim was definitively established as an "Allowed Claim". Id. The Commissioner thereafter asserted he was entitled to postconfirmation interest on his priority claim from the confirmation date of the plan to the date when it was definitively established as an "Allowed Claim". Id.

The District Court affirmed the lower bankruptcy court's holding that the Commissioner was not entitled to postpetition interest. Id. at 121. The court agreed with the bankruptcy court's interpretation of the debtor's bankruptcy plan and concluded that the plan unambiguously provided that no postconfirmation interest would be paid on the Commissioner's "Allowed Claim". Id. at 121. The court further found that the debtor's plan clearly "did not provide for deferred cash payments", but instead anticipated payments "as soon as the IRS' claim became an allowed claim." Id.

The District Court also suggested that the different underlying purposes of plans of reorganization and, conversely, plans of liquidation, might factor into an

inquiry focused on discerning whether a plan implicitly directs the debtor to make deferred payments. Id. Noting that the plan at issue effected a liquidation, the court stated that "the purpose of making deferred payments on a priority claim is to increase cash flow and thus increase the prospect of a successful reorganization. Here, no such purpose exists. White Farm's plan * * * did not provide for payments over time to facilitate reorganization." Id. This passage appears to imply that the court would more seriously consider whether a plan impliedly called for deferred payments on a priority claim if the provision providing for such payments was part of a larger bankruptcy reorganization. In a similar vein, the passage may be further interpreted as the court's intimation that deferred payments, and corresponding interest pursuant to 11 U.S.C. sec. 1129(a)(9)(C), may be more appropriately limited to bankruptcy reorganization plans if not expressly provided for in a liquidation plan.

In contrast to the bankruptcy plans in the cases cited by petitioner, the debtor's reorganization plan in In re Arrow Air, Inc., 101 B.R. at 333, provided that the Commissioner's priority tax claim would be paid "in full" on the effective date of the plan or as soon thereafter as feasible; the plan did not expressly provide for deferred cash payments. Payment of the Commissioner's priority claim was delayed for 11 months following the effective date of the plan. Id. at 335. The

Commissioner asserted that he was entitled to the accrual of interest on his claim during that period.   Id. at 334.

In reversing the lower bankruptcy court's holding that the delayed payment was not a deferred cash payment precluding the accrual of interest on the Commissioner's priority claim, the District Court focused its inquiry on whether the debtor's plan to pay the priority claim "in full" constituted a "guaranteed payment in the manner provided by * * * [11 U.S.C. sec. 1129(a)(9)(C)]."   Id. at 334-335.  The court construed the ambiguous wording in the plan against the debtor-drafter and found it was reasonable to interpret "in full" as reflecting a promise, consistent with 11 U.S.C. sec. 1129(a)(9)(C), to pay interest on the claim for any delay in payment. Id. at 335-336.  In so finding, the court placed the burden on the debtor-drafter to cure any ambiguities that might arise in the provisions of its bankruptcy plan.  Id. at 336.

In accord with this approach, the court in In re Collins, 184 B.R. at 155, found that a debtor's plan promising payment "in full" was ambiguous and interpreted the provision against the debtor to include postconfirmation interest on the Commissioner's priority claim.  The court also rejected the suggestion, first espoused in White Farm Equip. Co., that a liquidation plan may be construed differently from a reorganization plan with respect to the accrual of

postconfirmation interest on a priority tax claim.  Id.  While recognizing that "the purpose of allowing deferral of payments, instead of cash on confirmation, may be to facilitate reorganization", the court reiterated that "the present value requirement of * * * [11 U.S.C. sec. 1129(a)(9)(C)] ensures that priority claimants will be compensated for the 'time value of money' if their payment is delayed."  Id. (citing United States v. S. States Motor Inns, Inc., 709 F.2d at 652 (noting that the primary intent of 11 U.S.C. sec. 1129(a)(9)(C) is to provide the Government with a future amount equal in value to an amount paid in full upon the effective date of the plan)).

B.  Conclusion

We are not persuaded by the cases petitioner cites. We further decline to follow the reasoning of In re Pharmadyne Labs., Inc.  In that case the court summarily dismissed the applicability of 11 U.S.C. sec. 1129(a)(9)(C) without meaningful analysis.  In re Pharmadyne Labs., Inc., 53 B.R. at 522; see also In re Arrow Air, Inc., 101 B.R. at 335 ("There is no citation of authority and really very little analysis.  In short, we glean nothing of value from Pharmadyne other than the Government lost the issue.").  Further, the court did not apply, nor even consider, the doctrine of contra proferentem to construe the seemingly ambiguous plan

provisions against the debtor-drafter.[19]  Courts have widely applied the doctrine

when interpreting opaque bankruptcy plan provisions.  See, e.g., Cnty. of Ventura v.

Brawders (In re Brawders), 325 B.R. 405 (BAP 9th Cir. 2005); Harstad v. First Am.

Bank (In re Harstad), 155 B.R. 500 (Bankr. D. Minn. 1993), aff'd, 39 F.3d 898 (8th

Cir. 1994); cf. In re Stuart, 402 B.R. 111 (Bankr. E.D. Pa. 2009) (questioning the

liberal use of the doctrine).  Cognizant of the questionable precedential value

established by the Pharmadyne opinion, we conclude that it is of limited value in our

present inquiry.

The facts of the second case upon which respondent relies, White Farm

Equip. Co., are distinguishable on their face from those at present.  In White Farm

Equip. Co., 157 B.R. at 119, the debtor's bankruptcy plan explicitly provided for

payment of priority claims on a definite date:  the later of the effective date or the

date when each claim became an "Allowed Claim."  In contrast, petitioner's plan

provides only that respondent's priority claim would be paid "in full" following the

---

[19]The plan provision at issue in that case did not specifically address deferred payments.  Nonetheless, the plan allowed for the payment of priority tax claims  "to the extent there * * * [were] funds available for payment" following both the sale of the debtor's assets and the satisfaction of higher priority claims.  See In re Pharmadyne Labs., Inc., 53 B.R. 517, 518 (Bankr. D.N.J. 1985). This language may at least suggest the possibility of a delay in payment of the Commissioner's claim while the debtor liquidated its assets and, thereafter, applied the proceeds to satisfy the claims senior to those of the Commissioner.

satisfaction of senior claims.  Nothing in petitioner's plan delineates a specific payment date; rather, the prescribed hierarchal payment schedule in petitioner's plan alludes to the possibility of a delay in payment of respondent's claim.

Furthermore, in White Farm Equip. Co., the debtor's plan explicitly provided that the Commissioner's priority tax claims would not include interest for the period following the petition date.  Petitioner's plan contains no such restriction.

We are also unconvinced that the court in White Farm Equip. Co. was accurate when it seemingly accepted that the ultimate purpose of a bankruptcy plan may factor into whether delayed payments on claims are entitled to interest. No other court has endorsed such a premise, nor do we.  Instead, we adopt the finding of the court in In re Collins, 184 B.R. at 155, expressly rejecting any distinction in the application of 11 U.S.C. sec. 1129(a)(9)(C) to either liquidation or reorganization plans.  We, therefore, address petitioner's bankruptcy plan without regard to the anticipated ultimate result of the plan to petitioner.[20]

---

[20]Although petitioner, in a misguided attempt to align with the reasoning of United States v. White Farm Equip. Co. 157 B.R. 117 (N.D. Ill. 1993), contends that its bankruptcy plan constituted a plan of liquidation, as noted, infra, we find petitioner's bankruptcy plan to be a plan of reorganization.

Declining to invest in the scant reasoning of <u>Pharmadyne</u> or the inapposite factual circumstances of <u>White Farm Equip. Co.</u>, we turn to other relevant caselaw for guidance. We first note that the provisions of petitioner's bankruptcy plan concerning respondent's priority claim are nearly identical to the debtors' plans at issue in both <u>In re Arrow Air</u> and <u>In re Collins</u>. In those cases the respective courts found that language providing for the payment of the Commissioner's claims "in full" was ambiguous and should be construed against the debtor-drafters. Article 5.01[21] of petitioner's plan similarly provides that respondent's priority claim "shall be paid <u>in full</u> and in the order of priority set forth in 11 U.S.C. Section 507(a)" following the liquidation of certain assets. (Emphasis added.) Petitioner was represented by counsel when its bankruptcy plan was drafted and had the opportunity to clearly tailor the plan, if desired, to avoid both deferred payments and the accrual of postconfirmation interest on respondent's claim. We find instructive the court's observation in <u>Fawcett v. United States (In re Fawcett)</u>, 758 F.2d 588, 590-591 (11th Cir. 1985), which, while analyzing a bankruptcy plan provision concerning a debtor's payment on a secured claim, retains relevance to the issue at hand:

---

[21]Respondent's posttrial brief mistakenly cites art. 5.02 as the provision governing the payment of respondent's priority claims. Art. 5.02 refers to the payment of respondent's secured claim.

If a debtor submits a generalized statement that it will pay * * * in full-100%, creditors are entitled to interpret that statement as guaranteeing the payment of each and every part of the creditor's claim. If the debtor wishes to be more specific * * * it is the debtor's duty to put the creditor on notice by specifically detailing any exceptions. Failing this, the debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan. * * *

In accord with this quoted passage and the courts' decisions in In re Arrow Air and In re Collins, we will construe the ambiguous language in the bankruptcy plan against the debtor-drafter. Consequently, we find that article 5.01 provides for deferred payments and the corresponding accrual of interest on respondent's priority claim pursuant to Bankruptcy Code sec. 1129(a)(9)(C).

C. Postconfirmation Rate of Interest on Respondent's Priority Claim

Respondent did not offer the rate used in calculating interest on his priority claim. Indeed, respondent remains uncertain as to the manner by which interest was calculated on the claim.[22] Nonetheless, respondent now avers that the proper

---

[22]In his posttrial response to an order from this Court, respondent noted:

Respondent's counsel has reviewed the evidence in this case, which consists of witness testimony and 113 exhibits, and did not find any detailed information on the interest rate used by respondent in calculating the post-confirmation accrual of interest on his priority claim. However, respondent usually charges interest at the general underpayment rate under I.R.C. § 6621(a).

rate of postconfirmation interest on the priority claim is the rate under section

6621(a).[23]

Courts have taken different approaches in determining the proper interest

rate that a postconfirmation priority claim is afforded pursuant to 11 U.S.C. sec.

1129(a)(9)(C).[24]  The Court of Appeals for the Ninth Circuit, to which an appeal in

this case would lie, has held that a bankruptcy court "must make a case-by-case

determination of what interest rate the reorganizing debtor would have to pay a

creditor in order to obtain a loan on equivalent terms in the open market."  United

States v. Camino Real Landscape Maint. Contractors, Inc. (In re Camino Real

---

[23]Respondent's poor accounting pervades the entirety of his "calculations", making it difficult for petitioner to succinctly state its contentions to this Court.

[24]See United States v. Neal Pharmacal Co., 789 F.2d 1283, 1289 (8th Cir. 1986) (finding that the sec. 6621 rate is "clearly relevant" but noting courts must also consider market rates in general and whether the sec. 6621 rate reflects the risk, quality of any security, and term applicable in the particular case); Architectural Design, Inc. v. IRS (In re Architectural Design, Inc.), 59 B.R. 1019, 1023 (W.D. Va. 1986) (applying the sec. 6621 rate to an 11 U.S.C. sec. 1129(a)(9)(C) claim); In re Conn. Aerosols, Inc., 42 B.R. 706, 711 (D. Conn. 1984)  (holding that the 28 U.S.C. sec. 1961 rate would "best approximate market conditions and provide the IRS with the value of its claim as of the effective date of the plan"); In re Collins, 184 B.R. 151, 156-157 (Bankr. N.D. Fla. 1995)  (rejecting the rate of interest provided in 28 U.S.C. secs. 1961 and 6621 but noting that the consideration of both as "evidence of the proper market rate is permissible." (citing United States v. S. States Motor Inns, Inc. (In re S. States Motor Inns, Inc.), 709 F.2d. 647, 652 (11th Cir. 1983))); In re Fi-Hi Pizza, Inc., 40 B.R. 258, 272 (Bankr. D. Mass. 1984) (applying interest rate 2.5% above the sec. 6621 rate).

Landscape Maint. Contractors), 818 F.2d 1503, 1508 (9th Cir. 1987).  Consistent with this approach, the court expressly rejects "that the interest rate on deferred taxes for purposes of [11 U.S.C.] § 1129(a)(9)(C) is fixed as § 6621 provides."  Id. at 1505.  The court similarly asserts that such interest rates are not necessarily congruent with the rates paid on Treasury obligations because an inquiry into the appropriate rate should focus on the "debtor's cost of borrowing, not the government's."  Id. at 1506.  Nonetheless, both rates may aid a court in its factual inquiry.  Id. at 1506-1507.

The parties have not offered any evidence concerning the appropriate market rate of interest on respondent's priority claims.  Petitioner's failure to submit such evidence is excusable; respondent's is not.  Petitioner was placed in the unenviable position of attempting to discern the substance of respondent's calculations when respondent himself was unable to do so.  Respondent dismisses his outright failure to identify the foundation of his interest assessments and instead offers to this Court that he "usually charges interest at the general unemployment [sic] rate under I.R.C. § 6621(a)."[25]  We find respondent's position

---

[25]While we generally construe the terms of the ch. 11 plan against the drafter, we will not adopt respondent's position that sec. 6621 governs the rate of postconfirmation interest on his secured claim as that assertion is contrary to established Ninth Circuit law.  See  United States v.  Camino Real Landscape

(continued...)

untenable for two distinct reasons: (1) it presumes this Court will accept respondent's arbitrary interest assessments by accepting, at face value, his statement that this is what "usually" occurs; and (2) it does not reflect the appropriate law of the Ninth Circuit, as discussed supra.

With no evidence submitted to this Court concerning the relevant market rate of interest on respondent's claim, we cannot presently determine the propriety of respondent's assessments. Nonetheless, it is clear from respondent's inability to express to this Court the postconfirmation rate of interest he used in assessing interest on his priority claim that the Appeals officer did not properly obtain

---

[25](...continued)
Maint. Contractors, Inc. (In re Camino Real Landscape Maint. Contractors), 818 F.2d 1503,1508 (9th Cir. 1987).

verification that all applicable law and procedure[26] had been followed pursuant to section 6330(c)(1).[27]

## VIII. Penalties

Petitioner disputes the assessment of penalties on three alternate grounds: (1) the penalties improperly accrued postpetition; (2) the penalties should be abated for reasonable cause; or (3) petitioner's bankruptcy plan and the corresponding confirmation order preclude respondent from subsequently assessing and collecting postpetition failure to pay penalties. As noted supra, we review the penalty assessments de novo. See Goza v. Commissioner, 114 T.C. at 181-182. However, if respondent's determination was based on erroneous views

---

[26]For taxes like those at issue, the Appeals officer is generally required to verify under sec. 6330(c)(1) that a valid assessment was made, that notice and demand was issued, that the liability was not paid, and that the Final Notice of Intent to Levy and Notice of Your Right to a Hearing was issued to the taxpayer. Ron Lykins, Inc. v. Commissioner, 133 T.C. 87, 96-97 (2009); Marlow v. Commissioner, T.C. Memo. 2010-113. Federal taxes are validly assessed when they are formally recorded on a record of assessment. See sec. 6203.

Nonetheless, in circumstances such as those at issue, the Appeals officer should recognize that the general rules regarding statutory interest are altered. Accordingly, a superficial review of the formal record of assessment for tax periods affected by a bankruptcy proceeding is not sufficient to satisfy the requirements of sec. 6330(c)(1).

[27]It follows that the Appeals officer's failure to address petitioner's request for interest relief during petitioner's sec. 6330 hearing also, in and of itself, constitutes an abuse of discretion.

of the law and petitioner's unpaid liabilities were discharged in bankruptcy, then we must reject respondent's view and find that there was an abuse of discretion. See, e.g., Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Bussell v. Commissioner, 130 T.C. 222, 236 (2008); Swanson v. Commissioner, 121 T.C. 111, 119 (2003).

A. Assessment of Penalties

Section 6651(a)(3) imposes an addition to tax in the case of a failure to pay a tax required to be shown on a return, which was not so shown, within 21 days after the date of the IRS' notice and demand letter. The addition to tax is 0.5% of tax if the failure to pay is for not more than 1 month, with an additional 0.5% for each additional month or fraction thereof during which such failure to pay continues, not to exceed 25% in the aggregate. The failure to pay penalty thus may continue to accrue for up to 50 months, until payment. See Kimball v. Commissioner, T.C. Memo. 2008-78.

Generally, a taxpayer's pending bankruptcy case alters these aforementioned rules. Section 6658(a) provides that "No addition to the tax shall be made under section 6651, 6654, or 6655 for failure to make timely payment of tax with respect to a period during which a case is pending under title 11 of the United States

Code".[28]  Nonetheless, section 6658 does not prevent the Commissioner from assessing additions to tax which accrue during the pendency of the bankruptcy case related to employment taxes to the extent that they are withheld or collected from others.  Sec. 6658(b);  Kiesner v. IRS (In re Kiesner), 194 B.R. 452, 458 (Bankr. E.D. Wis. 1996); see also S. Rept. No. 96-1035, at 51 (1980), 1980-2 C.B. 620, 646 ("These relief rules do not, however, apply with respect to liability for penalties for failure to timely pay or deposit any employment tax required to be withheld by the debtor or trustee.").

Petitioner's unpaid tax for the taxable periods at issue constitutes employment tax liabilities.  Accordingly, failure to pay penalties properly accrued on those tax deficiencies throughout the pendency of petitioner's bankruptcy case.  In response to this Court's order after trial, respondent conceded that penalties did not validly accrue following the effective date of petitioner's bankruptcy plan; respondent is unable to conclusively demonstrate that all of his penalty assessments correspond to periods during the pendency of petitioner's bankruptcy case.[29]  Nonetheless, as

---

[28]Petitioner's bankruptcy was pending from the date it filed its petition until its case was closed on March 3, 2005.  See Rev. Rul. 2005-9, 2005-1 C.B. 470.

[29]Respondent's response to the Court's order states:

(continued...)

discussed <u>infra</u>, we find that all penalties which accrued postpetition on prepetition claims were discharged upon confirmation of petitioner's bankruptcy plan.

B. <u>Reasonable Cause</u>

The section 6651(a)(3) addition to tax is not imposed if the taxpayer proves that the failure to pay is due to reasonable cause and not willful neglect. Sec. 301.6651-1(a)(3), Proced. & Admin. Regs.; <u>see also</u> <u>Reese v. Commissioner</u>, T.C. Memo. 2006-21, <u>aff'd</u>, 201 Fed. Appx. 961 (4th Cir. 2006). Reasonable cause is shown if the taxpayer "exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship * * * if he paid on the due date." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Whether the taxpayer has shown reasonable cause is a question of fact to be decided on the entire record. <u>Duncan v. Commissioner</u>, T.C. Memo. 2000-269.

Petitioner submits that it exhibited "ordinary business care * * * and prudence * * * in providing payment to Respondent". In particular, petitioner testified that

---

[29](...continued)
In the present case, the evidentiary record does not contain a calculation or breakdown of the failure to pay penalties to enable respondent to determine which amounts, if any, accrued post-confirmation. Therefore, respondent is unable to definitively state that no failure to pay penalties accrued post-confirmation.

despite its best efforts it was precluded from following its bankruptcy plan and selling the Santa Rosa lot because title companies were unable to provide "free and clear" title to the property. Furthermore, petitioner cites the economic downturn in its business following the September 11, 2001, terrorist attacks as preventing the timely payment of its tax liabilities.[30] Petitioner provides no evidence correlating either situation with its failure to pay taxes when due.

Respondent counters that section 6658(b) allows for the accrual of postpetition penalties on the "trust fund" portion of petitioner's tax liabilities and that the aforementioned terrorist attacks had no bearing on petitioner's failure to pay withholding taxes. Respondent's settlement officer also testified that petitioner had a "history of not timely making deposits dating back to 1993." Petitioner never refuted this testimony.

Given these circumstances, we find that petitioner has not sufficiently established that its failure to pay its tax liabilities is due to reasonable cause and

---

[30]Petitioner, in a posttrial response to the Court's order, also alleged that its president's extended hospitalization, an embezzlement of funds by its controller, and a devastating patent suit all contributed to its failure to timely pay its tax liability. Petitioner, however, never submitted any evidence to substantiate these claims.

not willful neglect. <u>See</u> sec. 301.6651-1(a)(3), Proced. & Admin. Regs.

Accordingly, the section 6651(a)(3) addition to tax was properly imposed.

C. <u>Discharge of Debts</u>

Petitioner asserts that even if penalties were properly assessed during the

pendency of its bankruptcy case, its bankruptcy plan and the corresponding

confirmation order discharged those penalties.[31] We have jurisdiction to decide

whether a tax liability for which collection is at issue was discharged in bankruptcy.

---

[31]A discharge, however, does not protect the debtor's assets if those assets were subject to a Federal tax lien that was properly filed pursuant to sec. 6323 before the bankruptcy petition was filed. <u>See</u> 11 U.S.C. sec. 522(c)(2)(B). As the Supreme Court explained in <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 84 (1991), a discharge of personal liability in bankruptcy "extinguishes only one mode of enforcing a claim--namely, an action against the debtor in personam--while leaving intact another--namely, an action against the debtor in rem." <u>See</u> <u>Connor v. United States (In re Connor)</u>, 27 F.3d 365, 366 (9th Cir. 1994); <u>Iannone v. Commissioner</u>, 122 T.C. 287, 292-293 (2004); <u>see also</u> <u>Bussell v. Commissioner</u>, 130 T.C. 222, 235 (2008).

Respondent filed a Federal tax lien for the taxable period ending March 31, 2000, before petitioner's bankruptcy petition was filed. The tax liability for that period was subsequently satisfied in full with proceeds from property to which the tax lien corresponding to that period attached. However, respondent did not file Federal tax liens before the filing of the bankruptcy petition for periods ending June 30, 2000, and December 31, 2001. Respondent now endeavors to levy against petitioner for these latter two periods; accordingly, a determination of whether petitioner's bankruptcy plan discharged postpetition penalties accruing on the tax liabilities for the two periods directly relates to the appropriateness of respondent's proposed collection action in the present case.

Washington v. Commissioner, 120 T.C. 114, 121 (2003); Thomas v. Commissioner, T.C. Memo. 2003-231.

Respondent's Appeals officer did not consider the possibility that postpetition penalties were discharged under petitioner's bankruptcy plan; instead, he cursorily determined that the penalties were appropriately assessed.[32]  Respondent, in his posttrial brief, also failed to discuss the extent to which a bankruptcy discharge might affect the appropriateness of his collection activities.  In a posttrial order we directed respondent to address whether the discharge provision in petitioner's bankruptcy plan precludes the assessment and collection of postpetition additions to tax and penalties.[33]  In respondent's response he proffers:

---

[32]Respondent, in his posttrial response to the Court's order, conceded that failure to pay penalties should not have accrued after the effective date of petitioner's bankruptcy plan (March 26, 2003).  Accordingly, only the failure to pay penalties which accrued before the effective date of the plan are at issue.

[33]Our order stated as follows:

> In petitioner's pretrial brief, it asserts that article IX of the chapter 11 plan, which discharges petitioner from debts on confirmation, precludes respondent from assessing and collecting additional post-petition additions to tax and penalties.  Respondent did not address that article in its postural brief and should reconcile its directive with section 6658 (b), I .R. C.

Petitioner's reliance on the Article IX as grounds to preclude
respondent from assessing post-petition failure to pay penalties is
misplaced, because the discharge of debt occurred on the effective date
of the Plan, March 26, 2003, which date is more than sixteen months
after the petition date of November 9, 2001.  The discharge under
Article IX only precludes assessment of failure to pay penalties after
plan confirmation, not after the petition date as argued by petitioner.

Respondent cites no authority for this conclusion.

Article IX of petitioner's bankruptcy plan states:  "The Debtor shall be discharged from debts on confirmation."  Similarly the order confirming the plan provides that petitioner is "discharged from all dischargeable debts."[34]  Generally, pursuant to Bankruptcy Code section 1141(d)(1)(A), confirmation of a plan of reorganization grants a chapter 11 debtor a discharge of all debts arising prior to

---

[34]The qualifying term of "dischargeable" may suggest that the bankruptcy court intended the discharge limitations of Bankruptcy Code sec. 523 to apply. Nonetheless, this issue was not raised by respondent at trial, or in any postural brief or response.  We need not address it here.  See Munich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived--it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192; 330 W. Hubbard Rest. Corp. v. United States, 203 F.3d 990, 997 (7th Cir. 2000) (same); Larson v. Northrop Corp., 21 F.3d 1164, 1168 n.7 (D.C. Cir. 1994) (declining to reach issues neither argued nor briefed).

confirmation.[35]  Nonetheless, the confirmation of a plan does not discharge a debtor if:  (1) the plan provides for the liquidation of all or substantially all the property of the estate; (2) the debtor does not engage in business after consummation of the plan; and (3) the debtor would be denied a discharge under Bankruptcy Code sec. 727(a) if the case was filed as a chapter 7 proceeding.[36]  Bankruptcy Code sec. 1141(d)(3).  The "net effect" of this provision is that a "corporate debtor which is liquidated under chapter 11 and does not continue in business after its chapter 11 plan goes into effect does not receive a bankruptcy discharge."  In re SunCruz Casinos, LLC, 342 B.R. 370, 380 (Bankr. S.D. Fla. 2006).

Certain aspects of petitioner's confirmed bankruptcy plan resemble a general liquidation plan; specifically, the plan is labeled a "plan of liquidation" and provides for the liquidation of some, but not all, of petitioner's assets. Petitioner also referred to its bankruptcy plan during trial and on brief  as primarily

---

[35]The limitations to discharge provided in Bankruptcy Code sec. 523 apply only to individual debtors in a ch. 11 proceeding.  Bankruptcy Code sec. 1141(d)(2).

[36]Only a debtor who is an individual can receive a discharge under Bankruptcy Code sec. 727(a).  See In re SunCruz Casinos, LLC, 342 B.R. 370, 380 (Bankr. S.D. Fla. 2006).

a plan of liquidation.[37]  Nonetheless, the provisions of petitioner's bankruptcy plan, supplemented by the bankruptcy court's order, make clear that the purpose of the plan was a corporate reorganization, not a full asset liquidation.  For example, article VII of the plan provides:

> 7.02   Debtor shall operate the retail locations for a period of six (6) months.   Should said business produce a net operating profit during such period, such operating profit for a period of two years thereafter shall be distributed * * * .

Only in the event that the retail locations failed to produce a "net operating profit" during such period would petitioner be forced to sell the business.  The bankruptcy order also provides that "Confirmation of the Plan is not likely to be followed by the liquidation, or the need for <u>further financial reorganization</u>, of the Debtor or any successor to the Debtor under the Plan."  (Emphasis added.).  Implicit in this provision is the bankruptcy court's understanding that the plan effected a reorganization of petitioner's business, rather than a comprehensive liquidation.

Furthermore, the uncontroverted testimony of petitioner's president reveals that as of March 17, 2011, nearly eight years after confirmation of the plan:

---

[37]Petitioner's "request for a collection due process hearing" is indicative of petitioner's general confusion concerning its  bankruptcy plan.  In the request, petitioner initially refers to its plan as a "Reorganization", only later stating that it is a "liquidating Chapter 11 Plan".

Everett still files its annual state tax returns, still pays its $800-a-year annual minimum tax, and did not dissolve or become defunct as a result of any of its reorganization activities.

Petitioner also sold the Santa Rosa lot in December 2006, over three years after plan confirmation. We find these facts, without the benefit of any contrary evidence or authority cited by respondent, sufficient to establish that petitioner's plan does not fall under the exception to discharge provision in Bankruptcy Code section 1141(d)(3). See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 804 (5th Cir. 1997) (noting that where one alternative of a bankruptcy plan is liquidation of property two years after a plan's effective date does not render the plan a liquidation under 11 U.S.C. sec. 1141(d)(3)(A)).

Respondent has conceded that petitioner's bankruptcy plan makes no provision for the postpetition penalties which accrued on respondent's prepetition claims.[38] Accordingly, we find that the plan effectively discharged petitioner of failure to pay penalties which accrued during the pendency of its bankruptcy case.

---

[38]Priority tax claims do not include nonpecuniary penalties. 11 U.S.C. sec. 507(a)(8)(G); see also Erickson v. Commissioner, 172 B.R. 900, 915 (Bankr. D. Minn. 1994) (additions to tax assessed under sec. 6651(a)(3) "are not for compensatory or pecuniary loss").

We hold that respondent's Appeals officer's failure to address this discharge constitutes an abuse of discretion. See, e.g., Swanson v. Commissioner, 121 T.C. 111, 119 (2003) ("If respondent's determination was based on erroneous views of the law and petitioner's unpaid liabilities were discharged in bankruptcy, then we must reject respondent's views and find that there was an abuse of discretion.").

IX. The Application of Petitioner's Payments in Contravention of the Bankruptcy Plan

A confirmed chapter 11 plan will bind the debtor and all creditors to the terms of the plan. 11 U.S.C. sec. 1141(a) (2006); In re Space Bldg. Corp., 206 B.R. 269, 272-273 (D. Mass. 1996); In re Penrod, 169 B.R at 916 (the plan is essentially a new and binding contract between debtor and creditor).

Under article 5.01 of petitioner's bankruptcy plan claims entitled to priority pursuant to Bankruptcy Code section 507(a), which included respondent's priority tax claims, would be paid in full and "in the order of priority set forth in * * * [Bankruptcy Code sec. 507(a)]." Petitioner submits that respondent applied $13,691.30 in foreclosure sale proceeds to the tax period for the quarter ended June 30, 2000, to partially satisfy his priority claim ahead of claims of other unpaid, higher-priority creditors. This application of sale proceeds, petitioner asserts,

violates the express terms of the bankruptcy plan.[39]  Petitioner now requests a

refund for all inappropriately applied amounts.

Respondent, while acknowledging that other priority claimants were entitled

to payment in full before payment on his priority claim, notes that "The propriety of

the distributions under the Plan is complicated because the Tax Court does not have

all the facts and it may lack the authority to take corrective action."  Furthermore,

respondent questions whether he has the authority to refund such amounts to

petitioner administratively pursuant to section 6402(a).

Even if petitioner overpaid its tax liability for any period at issue, section

6330 does not provide this Court with jurisdiction to determine an overpayment or

to order a refund or credit of taxes paid.  See Greene-Thapedi v. Commissioner, 126

T.C. 1, 8-11 (2006); MacDonald v. Commissioner, T.C. Memo. 2009-240 ("In

general, our jurisdiction under section 6330(d)(1) is limited to reviewing whether the

Commissioner's proposed collection activity is appropriate."); see also Perkins v.

Commissioner, T.C. Memo. 2008-103.[40]  Petitioner, however, for purposes of this

---

[39]Petitioner's president testified that those unpaid creditors with higher priority than respondent include wage and vacation claim holders.  Their claims, in total, exceed $20,000.

[40]This Court maintains narrow overpayment jurisdiction in circumstances not congruous with those at issue.  See secs. 6404(h)(2)(B), 6512(b).

assertion, does not argue that it overpaid its tax liability; instead, petitioner asks this Court to direct respondent to return to petitioner a bankruptcy distribution. We see no authority that would allow us to do so. Respondent's priority tax claims remain unpaid, and following petitioner's default respondent was entitled to enforce payments due through his own administrative processes. See In re Jankins, 184 B.R. 488 (Bankr. E.D. Va. 1995). Petitioner must avail itself of other legal forums to pursue its desired redress.

X. Conclusion

We sustain respondent's collection activity concerning all liabilities respondent submitted in his proof of claim (discussed supra section III). Petitioner is also not entitled to an overpayment credit (discussed supra sections I, V, and VI).

We do not, however, sustain respondent's collection activity regarding: (1) postconfirmation interest on respondent's priority claim (discussed supra section VII); and (2) postpetition penalties (discussed supra section VIII). A Rule 155 calculation is needed to address these holdings.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, groundless, or otherwise without merit.

<u>Decision will be entered for respondent subject to a Rule 155 calculation</u>.